## JONES *v.* UNITED STATES

No. 81–5195.   Argued November 2, 1982—Decided June 29, 1983

Silas J. Wasserstrom argued the cause for petitioner. With him on the briefs were William J. Mertens and A. Franklin Burgess, Jr.

Joshua I. Schwartz argued the cause for the United States. With him on the brief were Solicitor General Lee,

*Assistant Attorney General Jensen*, and *Deputy Solicitor General Frey*.*

JUSTICE POWELL delivered the opinion of the Court.

The question presented is whether petitioner, who was committed to a mental hospital upon being acquitted of a criminal offense by reason of insanity, must be released because he has been hospitalized for a period longer than he might have served in prison had he been convicted.

## I

In the District of Columbia a criminal defendant may be acquitted by reason of insanity if his insanity is "affirmatively established by a preponderance of the evidence." D. C. Code § 24–301(j) (1981).[1] If he successfully invokes the insanity defense, he is committed to a mental hospital. § 24–301(d)(1).[2] The statute provides several ways of ob-

---

*Briefs of *amici curiae* urging reversal were filed by *Michael L. Burack, M. Carolyn Cox, Arthur B. Spitzer*, and *Charles S. Sims* for the American Civil Liberties Union et al.; and by *Joseph H. Rodriquez, Michael L. Perlin, Stanley C. Van Ness*, and *John J. Ensminger* for the Department of the Public Advocate, Division of Mental Health Advocacy, State of New Jersey.

*Robert B. Remar* filed a brief for the Georgia Legal Services Program, Inc., as *amicus curiae*.

[1] Section 24–301(j) provides:

"Insanity shall not be a defense in any criminal proceeding in the United States District Court for the District of Columbia or in the Superior Court of the District of Columbia, unless the accused or his attorney in such proceeding, at the time the accused enters his plea of not guilty or within 15 days thereafter or at such later time as the court may for good cause permit, files with the court and serves upon the prosecuting attorney written notice of his intention to rely on such defense. No person accused of an offense shall be acquitted on the ground that he was insane at the time of its commission unless his insanity, regardless of who raises the issue, is affirmatively established by a preponderance of the evidence."

[2] Section 24–301(d)(1) provides:

"If any person tried upon an indictment or information for an offense raises the defense of insanity and is acquitted solely on the ground that he was insane at the time of its commission, he shall be committed to a hospi-

taining release. Within 50 days of commitment the acquittee is entitled to a judicial hearing to determine his eligibility for release, at which he has the burden of proving by a preponderance of the evidence that he is no longer mentally ill or dangerous. § 24–301(d)(2).[3] If he fails to meet this burden at the 50-day hearing, the committed acquittee subsequently may be released, with court approval, upon certification of his recovery by the hospital chief of service. § 24–301(e).[4]

---

tal for the mentally ill until such time as he is eligible for release pursuant to this subsection or subsection (e) of this section."

Under this provision, automatic commitment is permissible only if the defendant himself raised the insanity defense. See H. R. Rep. No. 91–907, p. 74 (1970); *Lynch* v. *Overholser*, 369 U. S. 705 (1962).

[3] Section 24–301(d)(2) provides in relevant part:

"(A) A person confined pursuant to paragraph (1) of this subsection shall have a hearing, unless waived, within 50 days of his confinement to determine whether he is entitled to release from custody. . . .

.          .          .          .          .

"(B) If the hearing is not waived, the court shall cause notice of the hearing to be served upon the person, his counsel, and the prosecuting attorney and hold the hearing. Within 10 days from the date the hearing was begun, the court shall determine the issues and make findings of fact and conclusions of law with respect thereto. The person confined shall have the burden of proof. If the court finds by a preponderance of the evidence that the person confined is entitled to his release from custody, either conditional or unconditional, the court shall enter such order as may appear appropriate."

The statute does not specify the standard for determining release, but the District of Columbia Court of Appeals held in this case that, as in release proceedings under § 24–301(e) and § 21–545(b), the confined person must show that he is either no longer mentally ill or no longer dangerous to himself or others. See 432 A. 2d 364, 372, and n. 16 (1981) (en banc).

[4] Section 24–301(e) provides in relevant part:

"Where any person has been confined in a hospital for the mentally ill pursuant to subsection (d) of this section, and the superintendent of such hospital certifies: (1) That such person has recovered his sanity; (2) that, in the opinion of the superintendent, such person will not in the reasonable future be dangerous to himself or others; and (3) in the opinion of the superintendent, the person is entitled to his unconditional release from the hospital, and such certificate is filed with the clerk of the court in which the

Alternatively, the acquittee is entitled to a judicial hearing every six months at which he may establish by a preponderance of the evidence that he is entitled to release. § 24–301(k).[5]

Independent of its provision for the commitment of insanity acquittees, the District of Columbia also has adopted a civil-commitment procedure, under which an individual may be committed upon clear and convincing proof by the Govern-

person was tried, and a copy thereof served on the United States Attorney or the Corporation Counsel of the District of Columbia, whichever office prosecuted the accused, such certificate shall be sufficient to authorize the court to order the unconditional release of the person so confined from further hospitalization at the expiration of 15 days from the time said certificate was filed and served as above; but the court in its discretion may, or upon objection of the United States or the District of Columbia shall, after due notice, hold a hearing at which evidence as to the mental condition of the person so confined may be submitted, including the testimony of 1 or more psychiatrists from said hospital. The court shall weigh the evidence and, if the court finds that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others, the court shall order such person unconditionally released from further confinement in said hospital. If the court does not so find, the court shall order such person returned to said hospital. . . ."

[5] Section 24–301(k) provides in relevant part:

"(1) A person in custody or conditionally released from custody, pursuant to the provisions of this section, claiming the right to be released from custody, the right to any change in the conditions of his release, or other relief concerning his custody, may move the court having jurisdiction to order his release, to release him from custody, to change the conditions of his release, or to grant other relief.

.     .     .     .     .

"(3) . . . On all issues raised by his motion, the person shall have the burden of proof. If the court finds by a preponderance of the evidence that the person is entitled to his release from custody, either conditional or unconditional, a change in the conditions of his release, or other relief, the court shall enter such order as may appear appropriate.

.     .     .     .     .

"(5) A court shall not be required to entertain a 2nd or successive motion for relief under this section more often than once every 6 months. A court for good cause shown may in its discretion entertain such a motion more often than once every 6 months."

ment that he is mentally ill and likely to injure himself or others. § 21–545(b).[6] The individual may demand a jury in the civil-commitment proceeding. § 21–544. Once committed, a patient may be released at any time upon certification of recovery by the hospital chief of service. §§ 21–546, 21–548. Alternatively, the patient is entitled after the first 90 days, and subsequently at 6-month intervals, to request a judicial hearing at which he may gain his release by proving by a preponderance of the evidence that he is no longer mentally ill or dangerous. §§ 21–546, 21–547; see *Dixon* v. *Jacobs*, 138 U. S. App. D. C. 319, 328, 427 F. 2d 589, 598 (1970).

## II

On September 19, 1975, petitioner was arrested for attempting to steal a jacket from a department store. The next day he was arraigned in the District of Columbia Superior Court on a charge of attempted petit larceny, a misdemeanor punishable by a maximum prison sentence of one year. §§ 22–103, 22–2202. The court ordered petitioner committed to St. Elizabeths, a public hospital for the mentally ill, for a determination of his competency to stand trial.[7] On March 1, 1976, a hospital psychologist submitted a report to the court stating that petitioner was competent to stand trial, that petitioner suffered from "Schizophrenia, paranoid

---

[6] Section 21–545(b) provides in relevant part:

"If the court or jury finds that the person is mentally ill and, because of that illness, is likely to injure himself or other persons if allowed to remain at liberty, the court may order his hospitalization for an indeterminate period, or order any other alternative course of treatment which the court believes will be in the best interests of the person or of the public."

See *In re Nelson*, 408 A. 2d 1233 (D. C. 1979) (reading into the statute the due process requirement of "clear and convincing" proof).

[7] Section 24–301(a) authorizes the court to "order the accused committed to the District of Columbia General Hospital or other mental hospital designated by the court, for such reasonable period as the court may determine for examination and observation and for care and treatment if such is necessary by the psychiatric staff of said hospital."

type," and that petitioner's alleged offense was "the product of his mental disease." Record 51. The court ruled that petitioner was competent to stand trial. Petitioner subsequently decided to plead not guilty by reason of insanity. The Government did not contest the plea, and it entered into a stipulation of facts with petitioner. On March 12, 1976, the Superior Court found petitioner not guilty by reason of insanity and committed him to St. Elizabeths pursuant to § 24–301(d)(1).

On May 25, 1976, the court held the 50-day hearing required by § 24–301(d)(2)(A). A psychologist from St. Elizabeths testified on behalf of the Government that, in the opinion of the staff, petitioner continued to suffer from paranoid schizophrenia and that "because his illness is still quite active, he is still a danger to himself and to others." Tr. 9. Petitioner's counsel conducted a brief cross-examination, and presented no evidence.[8] The court then found that "the defendant-patient is mentally ill and as a result of his mental illness, at this time, he constitutes a danger to himself or others." *Id.*, at 13. Petitioner was returned to St. Elizabeths. Petitioner obtained new counsel and, following some procedural confusion, a second release hearing was held on February 22, 1977. By that date petitioner had been hospitalized for more than one year, the maximum period he could have spent in prison if he had been convicted. On that basis he demanded that he be released unconditionally or recommitted pursuant to the civil-commitment standards in § 21–545(b), including a jury trial and proof by clear and convincing evidence of his mental illness and dangerousness. The Superior Court denied petitioner's request for a civil-commitment hearing, reaffirmed the findings made at the

---

[8] Petitioner's counsel seemed concerned primarily about obtaining a transfer for petitioner to a less restrictive wing of the hospital. See Tr. 11–12.

May 25, 1976, hearing, and continued petitioner's commitment to St. Elizabeths.[9]

Petitioner appealed to the District of Columbia Court of Appeals. A panel of the court affirmed the Superior Court, 396 A. 2d 183 (1978), but then granted rehearing and reversed, 411 A. 2d 624 (1980). Finally, the court heard the case en banc and affirmed the judgment of the Superior Court. 432 A. 2d 364 (1981). The Court of Appeals rejected the argument "that the length of the prison sentence [petitioner] might have received determines when he is entitled to release or civil commitment under Title 24 of the D. C. Code." *Id.*, at 368. It then held that the various statutory differences between civil commitment and commitment of insanity acquittees were justified under the equal protection component of the Fifth Amendment. *Id.*, at 371–376.

We granted certiorari, 454 U. S. 1141 (1982), and now affirm.

## III

It is clear that "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington* v. *Texas*, 441 U. S. 418, 425 (1979). Therefore, a State must have "a constitutionally adequate purpose for the confinement." *O'Connor* v. *Donaldson*, 422 U. S. 563, 574 (1975). Congress has determined that a criminal defendant found not guilty by reason of insanity in the District of Columbia should be committed indefinitely to a mental institution for treatment and the protection of society. See H. R. Rep. No. 91–907, pp. 73–74 (1970); 432 A. 2d, at 371 ("[T]he District of Columbia statutory scheme for com-

---

[9] "A subsequent motion for unconditional release under § 301(k) was denied in March of 1977. Three months later, however, [petitioner] was granted conditional release on terms recommended by St. Elizabeths' staff, allowing daytime and overnight visits into the community. He was also admitted into the civil division of the hospital, though as a result of disruptive behavior, he was retransferred to the forensic division." 432 A. 2d, at 368, n. 6.

mitment of insane criminals is . . . a regulatory, prophylactic statute, based on a legitimate governmental interest in protecting society and rehabilitating mental patients"). Petitioner does not contest the Government's authority to commit a mentally ill and dangerous person indefinitely to a mental institution, but rather contends that "the petitioner's trial was not a constitutionally adequate hearing to justify an indefinite commitment." Brief for Petitioner 14.

Petitioner's argument rests principally on *Addington* v. *Texas, supra,* in which the Court held that the Due Process Clause requires the State in a civil-commitment proceeding to demonstrate by clear and convincing evidence that the individual is mentally ill and dangerous. 441 U. S., at 426–427. Petitioner contends that these due process standards were not met in his case because the judgment of not guilty by reason of insanity did not constitute a finding of present mental illness and dangerousness and because it was established only by a preponderance of the evidence.[10] Peti-

---

[10] In the Court of Appeals petitioner apparently based these arguments on equal protection rather than due process, arguing that it was irrational for the Government to deny him a civil-commitment hearing at which the Government bore the burden of proof by clear and convincing evidence. See *id.,* at 371. Both petitioner and the Government acknowledge that this equal protection argument essentially duplicates petitioner's due process argument. That is, if the Due Process Clause does not require that an insanity acquittee be given the particular procedural safeguards provided in a civil-commitment hearing under *Addington,* then there necessarily is a rational basis for equal protection purposes for distinguishing between civil commitment and commitment of insanity acquittees. See Reply Brief for Petitioner 22–23; Brief for United States 55. We agree, and therefore address petitioner's arguments in terms of the Due Process Clause.

Petitioner does raise one additional equal protection argument that stands on its own. The District of Columbia provides for a jury at civil-commitment hearings, see § 21–544, and petitioner contends that equal protection requires that insanity acquittees also be permitted to demand a jury at the 50-day hearing. Because we determine that an acquittee's commitment is based on the judgment of insanity at the criminal trial, rather than solely on the findings at the 50-day hearing, see *infra,* at 363–366, the relevant equal protection comparison concerns the procedures available at the criminal trial and at a civil-commitment hearing. We therefore

tioner then concludes that the Government's only conceivably legitimate justification for automatic commitment is to ensure that insanity acquittees do not escape confinement entirely, and that this interest can justify commitment at most for a period equal to the maximum prison sentence the acquittee could have received if convicted. Because petitioner has been hospitalized for longer than the one year he might have served in prison, he asserts that he should be released unconditionally or recommitted under the District's civil-commitment procedures.[11]

## A

We turn first to the question whether the finding of insanity at the criminal trial is sufficiently probative of mental illness and dangerousness to justify commitment. A verdict of not guilty by reason of insanity establishes two facts: (i) the defendant committed an act that constitutes a criminal offense, and (ii) he committed the act because of mental illness.

---

agree with the Court of Appeals that the absence of a jury at the 50-day hearing "is justified by the fact that the acquittee has had a right to a jury determination of his sanity at the time of the offense." 432 A. 2d, at 373.

[11] It is important to note what issues are not raised in this case. Petitioner has not sought appellate review of the Superior Court's findings in 1976 and 1977 that he remained mentally ill and dangerous, and, indeed, the record does not indicate that since 1977 he ever has sought a release hearing—a hearing to which he was entitled every six months.

Nor are we asked to decide whether the District's procedures for release are constitutional. As noted above, see *supra*, at 357–359, the basic standard for release is the same under either civil commitment or commitment following acquittal by reason of insanity: the individual must prove by a preponderance of the evidence that he is no longer dangerous or mentally ill. There is an important difference, however, in the release provisions for these two groups. A patient who is committed civilly is entitled to unconditional release upon certification of his recovery by the hospital chief of service, see § 21–546, whereas a committed insanity acquittee may be released upon such certification only with court approval, see § 24–301(e). Neither of these provisions is before the Court, as petitioner has challenged neither the adequacy of the release standards generally nor the disparity in treatment of insanity acquittees and other committed persons. See 432 A. 2d, at 373, n. 19.

Congress has determined that these findings constitute an adequate basis for hospitalizing the acquittee as a dangerous and mentally ill person. See H. R. Rep. No. 91–907, *supra*, at 74 (expressing fear that "dangerous criminals, particularly psychopaths, [may] win acquittals of serious criminal charges on grounds of insanity" and yet "escape hospital commitment"); S. Rep. No. 1170, 84th Cong., 1st Sess., 13 (1955) ("Where [the] accused has pleaded insanity as a defense to a crime, and the jury has found that the defendant was, in fact, insane at the time the crime was committed, it is just and reasonable in the Committee's opinion that the insanity, once established, should be presumed to continue and that the accused should automatically be confined for treatment until it can be shown that he has recovered"). We cannot say that it was unreasonable and therefore unconstitutional for Congress to make this determination.

The fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness.[12] See *Lynch* v. *Overholser*, 369 U. S. 705, 714 (1962) (The fact that the accused was found to have committed a criminal act is "strong evidence that his continued liberty could imperil 'the preservation of public peace'"). Indeed, this concrete evidence generally may be at least as persuasive as any predictions about dangerousness that might be made in a civil-commitment proceeding.[13] We do not agree

---

[12] The proof beyond a reasonable doubt that the acquittee committed a criminal act distinguishes this case from *Jackson* v. *Indiana*, 406 U. S. 715 (1972), in which the Court held that a person found incompetent to stand trial could not be committed indefinitely solely on the basis of the finding of incompetency. In *Jackson* there never was any affirmative proof that the accused had committed criminal acts or otherwise was dangerous.

[13] In attacking the predictive value of the insanity acquittal, petitioner complains that "[w]hen Congress enacted the present statutory scheme, it did not cite any empirical evidence indicating that mentally ill persons who have committed a criminal act are likely to commit additional dangerous acts in the future." Reply Brief for Petitioner 13. He further argues that the available research fails to support the predictive value of prior danger-

with petitioner's suggestion that the requisite dangerousness is not established by proof that a person committed a non-violent crime against property. This Court never has held that "violence," however that term might be defined, is a prerequisite for a constitutional commitment.[14]

---

ous acts. See *id.*, at 13–14. We do not agree with the suggestion that Congress' power to legislate in this area depends on the research conducted by the psychiatric community. We have recognized repeatedly the "uncertainty of diagnosis in this field and the tentativeness of professional judgment. The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment . . . ." *Greenwood* v. *United States*, 350 U. S. 366, 375 (1956). See *Estelle* v. *Smith*, 451 U. S. 454, 472 (1981); *Addington* v. *Texas*, 441 U. S. 418, 429–430 (1979); *Powell* v. *Texas*, 392 U. S. 514, 535–537 (1968) (plurality opinion). The lesson we have drawn is not that government may not act in the face of this uncertainty, but rather that courts should pay particular deference to reasonable legislative judgments.

[14] See *Overholser* v. *O'Beirne*, 112 App. D. C. 267, 276, 302 F. 2d 852, 861 (1961) (Burger, J.) ("[T]o describe the theft of watches and jewelry as 'non-dangerous' is to confuse danger with violence. Larceny is usually less violent than murder or assault, but in terms of public policy the purpose of the statute is the same as to both") (footnote omitted). Thus, the "danger" may be to property rights as well as to persons. It also may be noted that crimes of theft frequently may result in violence from the efforts of the criminal to escape or the victim to protect property or the police to apprehend the fleeing criminal.

The relative "dangerousness" of a particular individual, of course, should be a consideration at the release hearings. In this context, it is noteworthy that petitioner's continuing commitment may well rest in significant part on evidence independent of his acquittal by reason of insanity of the crime of attempted larceny. In December 1976 a medical officer at St. Elizabeths reported that petitioner "has a history of attempted suicide." Record 87. In addition, petitioner at one point was transferred to the civil division of the hospital, but was transferred back to the forensic division because of disruptive behavior. See n. 9, *supra.* The Government also advises that after petitioner was released unconditionally following the second panel decision below, he had to be recommitted on an emergency civil basis two weeks later for conduct unrelated to the original commitment. See Brief for United States 15, n. 18.

Nor can we say that it was unreasonable for Congress to determine that the insanity acquittal supports an inference of continuing mental illness. It comports with common sense to conclude that someone whose mental illness was sufficient to lead him to commit a criminal act is likely to remain ill and in need of treatment. The precise evidentiary force of the insanity acquittal, of course, may vary from case to case, but the Due Process Clause does not require Congress to make classifications that fit every individual with the same degree of relevance. See *Marshall* v. *United States*, 414 U. S. 417, 428 (1974). Because a hearing is provided within 50 days of the commitment, there is assurance that every acquittee has prompt opportunity to obtain release if he has recovered.

Petitioner also argues that, whatever the evidentiary value of the insanity acquittal, the Government lacks a legitimate reason for committing insanity acquittees automatically because it can introduce the insanity acquittal as evidence in a subsequent civil proceeding. This argument fails to consider the Government's strong interest in avoiding the need to conduct a *de novo* commitment hearing following every insanity acquittal—a hearing at which a jury trial may be demanded, § 21–544, and at which the Government bears the burden of proof by clear and convincing evidence. Instead of focusing on the critical question whether the acquittee has recovered, the new proceeding likely would have to relitigate much of the criminal trial. These problems accent the Government's important interest in automatic commitment. See *Mathews* v. *Eldridge*, 424 U. S. 319, 348 (1976). We therefore conclude that a finding of not guilty by reason of insanity is a sufficient foundation for commitment of an insanity acquittee for the purposes of treatment and the protection of society.

B

Petitioner next contends that his indefinite commitment is unconstitutional because the proof of his insanity was based only on a preponderance of the evidence, as compared to

*Addington*'s civil-commitment requirement of proof by clear and convincing evidence. In equating these situations, petitioner ignores important differences between the class of potential civil-commitment candidates and the class of insanity acquittees that justify differing standards of proof. The *Addington* Court expressed particular concern that members of the public could be confined on the basis of "some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable." 441 U. S., at 426–427. See also *O'Connor* v. *Donaldson*, 422 U. S., at 575. In view of this concern, the Court deemed it inappropriate to ask the individual "to share equally with society the risk of error." *Addington*, 441 U. S., at 427. But since automatic commitment under § 24–301(d)(1) follows only if the *acquittee himself* advances insanity as a defense and proves that his criminal act was a product of his mental illness,[15] there is good reason for diminished concern as to the risk of error.[16] More important, the proof that he committed a criminal act as a result of mental illness eliminates the risk that he is being committed for mere "idiosyncratic behavior," *Addington*, 441 U. S., at 427. A criminal act by definition is not "within a range of conduct that is generally acceptable." *Id.*, at 426–427.

We therefore conclude that concerns critical to our decision in *Addington* are diminished or absent in the case of insanity acquittees. Accordingly, there is no reason for adopting the same standard of proof in both cases. "[D]ue process is flexible and calls for such procedural protections as the par-

---

[15] See n. 2, *supra*. In this case petitioner stipulated that he had committed the offense by reason of insanity.

[16] That petitioner raised the insanity defense also diminishes the significance of the deprivation. The *Addington* Court noted that the social stigma of civil commitment "can have a very significant impact on the individual." 441 U. S., at 426. A criminal defendant who successfully raises the insanity defense necessarily is stigmatized by the verdict itself, and thus the commitment causes little additional harm in this respect.

ticular situation demands." *Morrissey* v. *Brewer*, 408 U. S. 471, 481 (1972). The preponderance of the evidence standard comports with due process for commitment of insanity acquittees.[17]

## C

The remaining question is whether petitioner nonetheless is entitled to his release because he has been hospitalized for a period longer than he could have been incarcerated if convicted. The Due Process Clause "requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson* v. *Indiana*, 406 U. S. 715, 738 (1972). The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness. The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous. See *O'Connor* v. *Donaldson*, *supra*, at 575–576; 432 A. 2d, at 372, and n. 16; H. R. Rep. No. 91–907, pp. 73–74 (1970). And because it is impossible to predict how long it will take for any given individual to recover—or indeed whether he ever will recover—Congress has chosen, as it has with respect to civil commitment, to leave the length of commitment indeterminate, subject to periodic review of the patient's suitability for release.

In light of the congressional purposes underlying commitment of insanity acquittees, we think petitioner clearly errs in contending that an acquittee's hypothetical maximum sentence provides the constitutional limit for his commitment. A particular sentence of incarceration is chosen to reflect society's view of the proper response to commission of a par-

---

[17] A defendant could be required to prove his insanity by a higher standard than a preponderance of the evidence. See *Leland* v. *Oregon*, 343 U. S. 790, 799 (1952). Such an additional requirement hardly would benefit a criminal defendant who wants to raise the insanity defense, yet imposition of a higher standard would be a likely legislative response to a holding that an insanity acquittal could support automatic commitment only if the verdict were supported by clear and convincing evidence.

ticular criminal offense, based on a variety of considerations such as retribution, deterrence, and rehabilitation. See, e. g., *Gregg* v. *Georgia,* 428 U. S. 153, 183–186 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.); *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 168 (1963); *Williams* v. *New York,* 337 U. S. 241, 248–249 (1949). The State may punish a person convicted of a crime even if satisfied that he is unlikely to commit further crimes.

Different considerations underlie commitment of an insanity acquittee. As he was not convicted, he may not be punished.[18] His confinement rests on his continuing illness and dangerousness. Thus, under the District of Columbia statute, no matter how serious the act committed by the acquittee, he may be released within 50 days of his acquittal if he has recovered. In contrast, one who committed a less serious act may be confined for a longer period if he remains ill and dangerous. There simply is no necessary correlation between severity of the offense and length of time necessary for recovery. The length of the acquittee's hypothetical criminal sentence therefore is irrelevant to the purposes of his commitment.[19]

---

[18] As the Court of Appeals held below, "[s]ociety may not excuse a defendant's criminal behavior because of his insanity and at the same time punish him for invoking an insanity defense." 432 A. 2d, at 369.

[19] The Court has held that a convicted prisoner may be treated involuntarily for particular psychiatric problems, but that upon expiration of his prison sentence he may be committed only as would any other candidate for civil commitment. See *McNeil* v. *Director, Patuxent Institution,* 407 U. S. 245 (1972); *Humphrey* v. *Cady,* 405 U. S. 504 (1972); *Baxstrom* v. *Herold,* 383 U. S. 107 (1966). None of those cases involved an insanity acquittee, and none suggested that a person under noncriminal confinement could not be hospitalized in excess of the period for which he could have served in prison if convicted for the dangerous acts he had committed.

The inherent fallacy of relying on a criminal sanction to determine the length of a therapeutic confinement is manifested by petitioner's failure to suggest any clear guidelines for deciding when a patient must be released. For example, he does not suggest whether the Due Process Clause would require States to limit commitment of insanity acquittees to maximum sen-

## IV

We hold that when a criminal defendant establishes by a preponderance of the evidence that he is not guilty of a crime by reason of insanity, the Constitution permits the Government, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society. This holding accords with the widely and reasonably held view that insanity acquittees constitute a special class that should be treated differently from other candidates for commitment.[20] We have observed before that "[w]hen Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation . . . ." *Marshall* v. *United States*, 414 U. S., at 427. This admonition has particular force in the context of legislative efforts to deal with the special problems raised by the insanity defense.

The judgment of the District of Columbia Court of Appeals is

*Affirmed.*

---

tences or minimum sentences. Nor does he explain what should be done in the case of indeterminate sentencing or suggest whether account would have to be taken of the availability of release time or the possibility of parole. And petitioner avoids entirely the important question how his theory would apply to those persons who committed especially serious criminal acts. Petitioner thus would leave the States to speculate how they may deal constitutionally with acquittees who might have received life imprisonment, life imprisonment without possibility of parole, or the death penalty.

[20] A recent survey of commitment statutes reported that 14 jurisdictions provide automatic commitment for at least some insanity acquittees, while many other States have a variety of special methods of committing insanity acquittees. See Note, Commitment Following an Insanity Acquittal, 94 Harv. L. Rev. 605, 605–606, and nn. 4–6 (1981). Nineteen States commit insanity acquittees under the same procedures used for civil commitment. *Id.*, at 605, n. 3. It appears that only one State has enacted into law petitioner's suggested requirement that a committed insanity acquittee be released following expiration of his hypothetical maximum criminal sentence. See Conn. Gen. Stat. § 53a–47(b) (1981).

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

The Court begins by posing the wrong question. The issue in this case is not whether petitioner must be released because he has been hospitalized for longer than the prison sentence he might have served had he been convicted, any more than the question in a motion to suppress an allegedly coerced confession at a murder trial is whether the murderer should go free.[1] The question before us is whether the fact that an individual has been found "not guilty by reason of insanity," by itself, provides a constitutionally adequate basis for involuntary, indefinite commitment to psychiatric hospitalization.

None of our precedents directly addresses the meaning of due process in the context of involuntary commitments of persons who have been acquitted by reason of insanity. Petitioner's argument rests primarily on two cases dealing with civil commitments: *O'Connor* v. *Donaldson*, 422 U. S. 563 (1975), and *Addington* v. *Texas*, 441 U. S. 418 (1979). *O'Connor* held that a mentally ill individual has a "right to liberty" that a State may not abridge by confining him to a mental institution, even for the purpose of treating his illness, unless in addition to being mentally ill he is likely to harm himself or others if released. 422 U. S., at 573–576; see *id.*, at 589 (BURGER, C. J., concurring). Then, in *Addington*, we carefully evaluated the standard of proof in civil commitment proceedings. Applying the due process analysis of *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976),

---

[1] If we were to determine that the standards under which petitioner was committed did not satisfy the Due Process Clause, he would be "released" only in the most formalistic sense of the word. Realistically, he would probably be recommitted, assuming that the Government could carry its burden of proof at a regular civil commitment hearing. The facts that the Court discusses *ante*, at 365, n. 14, would certainly be relevant at such a hearing. But they are irrelevant to the question before us because they have never been assessed under the "clear and convincing" evidence standard.

we held that "due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence," 441 U. S., at 427, specifically "clear and convincing evidence," *id.*, at 433.[2]

The core of both cases is a balance of three factors: the governmental interest in isolating and treating those who may be mentally ill and dangerous; the difficulty of proving or disproving mental illness and dangerousness in court; and the massive intrusion on individual liberty that involuntary psychiatric hospitalization entails. Petitioner contends that the same balance must be struck in this case, and that the Government has no greater interest in committing him indefinitely than it has in ordinary civil commitment cases governed by the standards of *O'Connor* and *Addington*. While conceding that the Government may have legitimate reasons to commit insanity acquittees for some definite period without carrying the burden of proof prescribed in *Addington*,[3]

---

[2] We held that a "preponderance of the evidence" standard was not sufficient to preserve fundamental fairness to candidates for civil commitment in light of their strong interest in avoiding involuntary confinement and psychiatric treatment. See 441 U. S., at 427; cf. *Santosky* v. *Kramer*, 455 U. S. 745, 766–770 (1982). Yet to require as a constitutional matter more than clear and convincing evidence—*i. e.*, proof beyond a reasonable doubt—would unduly impair governmental efforts to protect both the mentally ill and society at large. See 441 U. S., at 427–431.

[3] Petitioner does not dispute that the Government may commit him solely on the basis of his insanity acquittal for a definite period—as long as he could have been incarcerated had he been convicted on the criminal charges against him rather than acquitted by reason of insanity. The issue, therefore, is not whether due process forbids treating insanity acquittees differently from other candidates for commitment. Petitioner is willing to concede that they may be treated differently for some purposes, and for a limited period of time. The dispute before us, rather, concerns the question whether the differences between insanity acquittees and other candidates for civil commitment justify committing insanity acquittees *indefinitely*, as D. C. Code § 24–301 (1981) provides, without the Government *ever* having to meet the procedural requirements of *Addington*.

he argues that he cannot be confined indefinitely unless the Government accords him the minimum due process protections required for civil commitment.

## A

The obvious difference between insanity acquittees and other candidates for civil commitment is that, at least in the District of Columbia, an acquittal by reason of insanity implies a determination beyond a reasonable doubt that the defendant in fact committed the criminal act with which he was charged. See *Bethea* v. *United States*, 365 A. 2d 64, 93–95 (D. C. 1976); D. C. Code § 24–301(c) (1981). Conceivably, the Government may have an interest in confining insanity acquittees to punish them for their criminal acts, but the Government disclaims any such interest, and the Court does not rely on it.[4] In any event, we have held that the Govern-

---

A number of our decisions have countenanced involuntary commitment without the full protections of *Addington* and *O'Connor*, but for the most part these have involved persons already in custody and strictly limited periods of psychiatric institutionalization. *E. g., Jackson* v. *Indiana*, 406 U. S. 715, 738 (1972) (acknowledging that the State's interest in determining whether an accused would become competent to stand trial in the foreseeable future justified commitment "for a reasonable period of time"); *McNeil* v. *Director, Patuxent Institution*, 407 U. S. 245, 249–250 (1972) (accepting the legitimacy of short-term commitment of a convicted criminal for psychiatric evaluation); *Humphrey* v. *Cady*, 405 U. S. 504, 510 (1972) (commitment of convicted sex offender, limited to duration of sentence); *Baxstrom* v. *Herold*, 383 U. S. 107, 111 (1966) (commitment of prison inmates who are determined to be mentally ill during their prison term). See also *Parham* v. *J. R.*, 442 U. S. 584, 617–619 (1979) (wards of the State); Note, 31 Stan. L. Rev. 425 (1979) (burden and standard of proof in short-term civil commitment).

[4] Punishing someone acquitted by reason of insanity would undoubtedly implicate important constitutional concerns. It is questionable that confinement to a mental hospital would pass constitutional muster as appropriate punishment for any crime. The insanity defense has traditionally been viewed as premised on the notion that society has no interest in punishing insanity acquittees, because they are neither blameworthy nor the appro-

ment may not impose psychiatric commitment as an alternative to penal sentencing for longer than the maximum period of incarceration the legislature has authorized as punishment for the crime committed. *Humphrey* v. *Cady*, 405 U. S. 504, 510–511 (1972). Once Congress has defined a crime and the punishment for that crime, additional confinement can be justified only by proof beyond a reasonable doubt of additional facts, subject to the limits of the Double Jeopardy Clause, and upon notice to defendants that they are subject to such additional punishment. See *Specht* v. *Patterson*, 386 U. S. 605, 610 (1967); *In re Winship*, 397 U. S. 358, 361–364 (1970).

## B

Instead of relying on a punishment rationale, the Court holds that a finding of insanity at a criminal trial "is sufficiently probative of mental illness and dangerousness to justify commitment." *Ante*, at 363. First, it declares that "[t]he fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness." *Ante*, at 364. Second, the Court decides that "[i]t comports with common sense to conclude that someone whose mental illness was sufficient to lead him to commit a criminal act is likely to remain ill and in need of treatment." *Ante*, at 366. Despite their superficial appeal, these propositions cannot support the decision necessary to the Court's disposition of this case—that the Government may be excused from carrying the *Addington* burden of proof with respect to each of the *O'Connor* elements of mental illness and dangerousness in committing petitioner for an indefinite period.

---

priate objects of deterrence. See A. Goldstein, The Insanity Defense 15 (1967). In addition, insanity and *mens rea* stand in a close relationship, which this Court has never fully plumbed. See *Powell* v. *Texas*, 392 U. S. 514, 536–537 (1968) (opinion of MARSHALL, J.); *Leland* v. *Oregon*, 343 U. S. 790, 800 (1952); cf. *Mullaney* v. *Wilbur*, 421 U. S. 684 (1975).

1. Our precedents in other commitment contexts are inconsistent with the argument that the mere facts of past criminal behavior and mental illness justify indefinite commitment without the benefits of the minimum due process standards associated with civil commitment, most importantly proof of present mental illness and dangerousness by clear and convincing evidence.[5]  In *Addington* itself, the petitioner did not dispute that he had engaged in a wide variety of assaultive conduct that could have been the basis for criminal charges had the State chosen to prosecute him.   See 441 U. S., at 420–421.   Similarly, the petitioner in *Jackson* v. *Indiana*, 406 U. S. 715 (1972), had been charged with two robberies, yet we required the State to follow its civil commitment procedures if it wished to commit him for more than a strictly limited period.   *Id.*, at 729–730.   As the Court indicates, see *ante*, at 364, n. 12, these cases are perhaps distinguishable on the ground that there was never proof that a *crime* had been committed, although in *Addington* the petitioner's violent acts were before the jury.   That objection, however, cannot be leveled at *Baxstrom* v. *Herold*, 383 U. S. 107 (1966), or *Humphrey* v. *Cady*, *supra*.

The petitioner in *Baxstrom* had been convicted of assault and sentenced to a term in prison, during which he was certified as insane by a prison physician.   At the expiration of his criminal sentence, he was committed involuntarily to a state mental hospital under procedures substantially less protective than those used for civil commitment.   383 U. S., at

---

[5] Many of these decisions rely on the Equal Protection Clause of the Fourteenth Amendment as well as, or instead of, the Due Process Clause. As in *Bearden* v. *Georgia*, 461 U. S. 660, 665 (1983), "[d]ue process and equal protection principles converge in the Court's analysis of these cases," and under our current understanding of the meaning of these Clauses it is perhaps more appropriate to focus primarily on due process considerations. With the exception of petitioner's argument that he should receive a jury trial, see n. 17, *infra*, there is no difference between the forms of relief he seeks under the separate theories.   Cf. *ante*, at 362–363, n. 10.

108–110. We held that, once he had served his sentence, Baxstrom could not be treated differently from other candidates for civil commitment. *Id.*, at 112–113. The principal difference between this case and *Baxstrom* is petitioner's admission, intrinsic to an insanity plea in the District of Columbia at the time of his trial, that his crime was "the product" of his mental illness. *Humphrey*, however, indicates the limited importance of that distinction.

In *Humphrey*, the petitioner had been convicted of contributing to the delinquency of a minor, the court had determined that his crime was "probably directly motivated by a desire for sexual excitement," and the State had established his "need" for psychiatric treatment by a preponderance of the evidence at a special hearing. 405 U. S., at 506–507. He was committed for treatment for the maximum period for which he could have been incarcerated as punishment for his crime—as in this case, one year—and at the end of that period his commitment was renewed for five more years after a judicial hearing on his present mental illness and dangerousness. See *id.*, at 507. Thus, the situation was almost precisely identical to that in this case after petitioner's February 1977 hearing—the defendant had been found to have committed a criminal act beyond a reasonable doubt, a connection between that act and a mental disorder had been established by a preponderance of the evidence, and he had been confined for longer than the maximum sentence he could have received. If anything, Humphrey had received *more* protections than Michael Jones; the State had borne the burden of proof by a preponderance of the evidence at his "release hearing," *ibid.*, and his recommitment was for a strictly limited time. Nevertheless, we held that Humphrey's constitutional challenge to the renewal order had substantial merit, because Humphrey had not received the procedural protections given persons subject to civil commitment.[6]

---

[6] In *Humphrey*, we held only that the petitioner had raised a substantial constitutional claim and that the Court of Appeals had erred in refusing to certify probable cause for an appeal from the District Court's dismissal of

2. The Government's interests in committing petitioner are the same interests involved in *Addington, O'Connor, Baxstrom,* and *Humphrey*—isolation, protection, and treatment of a person who may, through no fault of his own, cause harm to others or to himself. Whenever involuntary commitment is a possibility, the Government has a strong interest in accurate, efficient commitment decisions. Nevertheless, *Addington* held both that the government's interest in accuracy was not impaired by a requirement that it bear the burden of persuasion by clear and convincing evidence, and that the individual's interests in liberty and autonomy required the government to bear at least that burden. An acquittal by reason of insanity of a single, nonviolent misdemeanor is not a constitutionally adequate substitute for the due process protections of *Addington* and *O'Connor, i. e.,* proof by clear and convincing evidence of present mental illness or dangerousness, with the government bearing the burden of persuasion.

A "not guilty by reason of insanity" verdict is backward-looking, focusing on one moment in the past, while commitment requires a judgment as to the present and future. In some jurisdictions, most notably in federal criminal trials, an acquittal by reason of insanity may mean only that a jury found a reasonable doubt as to a defendant's sanity and as to the causal relationship between his mental condition and his crime. See *Davis* v. *United States,* 160 U. S. 469 (1895). As we recognized in *Addington,* "[t]he subtleties and nuances

---

his habeas corpus petition. See 405 U. S., at 506–508. We remanded for an evidentiary hearing. Under today's ruling, however, it is difficult to see how a constitutional claim like the one made in *Humphrey* could conceivably have merit, unless there is somehow a constitutional difference between Colorado's pre-1972 "mentally disordered sex offender" statute and the District of Columbia's "not guilty by reason of insanity" statute. Both statutes were designed to authorize involuntary commitment for psychiatric treatment of persons who have committed crimes upon a finding by a preponderance of the evidence that the crime was the product of a mental condition appropriate for psychiatric therapy.

of psychiatric diagnosis render certainties virtually beyond reach in most situations." 441 U. S., at 430. The question is not whether "government may not act in the face of this uncertainty," *ante,* at 365, n. 13; everyone would agree that it can. Rather, the question is whether—in light of the uncertainty about the relationship between petitioner's crime, his present dangerousness, and his present mental condition— the Government can force him for the rest of his life "to share equally with society the risk of error," 441 U. S., at 427.[7]

It is worth examining what is known about the possibility of predicting dangerousness from *any* set of facts. Although a substantial body of research suggests that a consistent pattern of violent behavior may, from a purely statistical standpoint, indicate a certain likelihood of further violence in the future,[8] mere statistical validity is far from perfect for purposes of predicting which individuals will be dangerous. Commentators and researchers have long acknowledged that even the best attempts to identify dangerous individuals on the basis of specified facts have been inaccurate roughly two-thirds of the time, almost always on the side of overprediction.[9] On a clinical basis, mental health profes-

---

[7] Indeed, the District of Columbia's commitment scheme for insanity acquittees, unlike the civil commitment statute applied in *Addington,* permanently places the burden of persuasion on petitioner, thus forcing him to bear the lion's share of the risk.

[8] J. Monahan, The Clinical Prediction of Violent Behavior 71, 80–81 (NIMH 1980) (Monahan); see, *e. g.,* Cocozza, Melick, & Steadman, Trends in Violent Crime Among Ex-Mental Patients, 16 Criminology 317 (1978) (Cocozza); Pasewark, Pantle, & Steadman, The Insanity Plea in New York State, 51 N. Y. St. B. J. 186, 221–222 (1979).

[9] See American Psychiatric Assn., Task Force Report on Clinical Aspects of the Violent Individual 24 (1974) (APA Task Force Report); Monahan 44–61; Diamond, The Psychiatric Prediction of Dangerousness, 123 U. Pa. L. Rev. 439, 447 (1974); Note, Rules for an Exceptional Class: The Commitment and Release of Persons Acquitted of Violent Offenses by Reason of Insanity, 57 N. Y. U. L. Rev. 281, 298–299 (1982). See also Megargee, The Prediction of Dangerous Behavior, 3 Crim. Justice & Behavior 3, 11 (1976) ("Whatever the behavior sample the clinician selects,

sionals can diagnose past or present mental condition with some confidence, but strong institutional biases lead them to err when they attempt to determine an individual's dangerousness, especially when the consequence of a finding of dangerousness is that an obviously mentally ill patient will remain within their control.[10] Research is practically nonexistent on the relationship of *nonviolent* criminal behavior, such as petitioner's attempt to shoplift, to future dangerousness. We do not even know whether it is even statistically valid as a predictor of similar nonviolent behavior, much less of behavior posing more serious risks to self and others.

Even if an insanity acquittee remains mentally ill, so long as he has not repeated the same act since his offense the passage of time diminishes the likelihood that he will repeat it.[11] Furthermore, the *frequency* of prior violent behavior is an important element in any attempt to predict future violence.[12] Finally, it cannot be gainsaid that some crimes are more indicative of dangerousness than others. Subject to the limits of *O'Connor*, a State may consider nonviolent misdemeanors "dangerous," but there is room for doubt whether a single attempt to shoplift and a string of brutal murders are equally

---

it is no secret that the validity of our assessment techniques is less than perfect, and too often less than satisfactory").

[10] See APA Task Force Report 25; Monahan & Cummings, Prediction of Dangerousness as a Function of its Perceived Consequences, 2 J. Crim. Justice 239 (1974). The record of this case strongly suggests that petitioner has been the victim of such bias. At petitioner's first post-commitment hearing, a St. Elizabeths staff psychologist first testified that "because his illness is still quite active, he is still a danger to himself and to others," then explained that "[w]e would like to keep him still at the hospital and work with him." Tr. 9 (May 25, 1976).

[11] Monahan 52, 72; Rubin, Prediction of Dangerousness in Mentally Ill Criminals, 27 Archives of General Psychiatry 397, 401–406 (1972). See also Quinsey, The Baserate Problem and the Prediction of Dangerousness: A Reappraisal, 8 J. Psychiatry & Law 329 (1980).

[12] See Monahan 107. The Cocozza study showed that ex-mental patients with a single prior arrest were slightly less likely than members of the general population to be arrested for a violent crime.

accurate and equally permanent predictors of dangerousness.[13] As for mental illness, certainly some conditions that satisfy the "mental disease" element of the insanity defense do not persist for an extended period—thus the traditional inclusion of "temporary insanity" within the insanity defense.

Close reading of the Court's opinion reveals the utter emptiness of the legislative judgment it finds so unproblematic. Today's decision may overrule *Humphrey* by implication. It does not, however, purport to overrule *Baxstrom* or any of the cases which have followed *Baxstrom*.[14] It is clear, therefore, that the separate facts of criminality and mental illness cannot support indefinite psychiatric commitment, for both were present in *Baxstrom*. The Court's careful phrasing indicates as much: "someone *whose mental illness was sufficient to lead him to commit a criminal act* is likely to remain ill and in need of treatment." *Ante*, at 366 (emphasis added). The Court relies on a *connection* between mental condition and criminal conduct that is unique to verdicts of "not guilty by reason of insanity." Yet the relevance of that connection, as opposed to each of its separate components, is far from a matter of obvious "common sense." None of the available evidence that criminal behavior by the mentally ill is likely to repeat itself distinguishes between behaviors that were "the product" of mental illness and those that were not.[15] It is

---

[13] The Court responds that "crimes of theft frequently may result in violence." *Ante*, at 365, n. 14. When they do, that fact may well be relevant to, or even dispositive of, the dangerousness issue at a proper commitment hearing. In this case, however, petitioner's attempt to shoplift involved neither actual violence nor any attempt to resist or evade arrest. It is difficult to see how the Court's generalization justifies relieving the Government of its *Addington-O'Connor* burden of proving present dangerousness by clear and convincing evidence.

[14] *E. g., Jackson* v. *Indiana*, 406 U. S., at 723–730; *Waite* v. *Jacobs*, 154 U. S. App. D. C. 281, 475 F. 2d 392 (1973); *United States* v. *Brown*, 155 U. S. App. D. C. 402, 478 F. 2d 606 (1973). See also *McNeil* v. *Director, Patuxent Institution*, 407 U. S., at 249–250.

[15] See generally the sources cited in nn. 8–10, *supra*. To date, no one has established a connection between violence and psychiatric disorders.

completely unlikely that persons acquitted by reason of insanity display a rate of future "dangerous" activity higher than civil committees with similar arrest records, or than persons convicted of crimes who are later found to be mentally ill. The causal connection between mental condition and criminal behavior that "not guilty by reason of insanity" formulations universally include is more a social judgment than a sound basis for determining dangerousness.

Given the close similarity of the governmental interests at issue in this case and those at issue in *Addington*, and the highly imperfect "fit" between the findings required for an insanity acquittal and those required under *O'Connor* to support an indefinite commitment, I cannot agree that the Government should be excused from the burden that *Addington* held was required by due process.[16]

3. In considering the requirements of due process, we have often inquired whether alternative procedures more protective of individual interests, at a reasonable cost, were likely to accomplish the State's legitimate objectives. See,

---

APA Task Force Report 30; Cocozza 330; Rabkin, Criminal Behavior of Discharged Mental Patients: A Critical Appraisal of the Research, 86 Psych. Bull. 1 (1979).

[16] Note that extended institutionalization may effectively make it impossible for an individual to prove that he is no longer mentally ill and dangerous, both because it deprives him of the economic wherewithal to obtain independent medical judgments and because the treatment he receives may make it difficult to demonstrate recovery. The current emphasis on using psychotropic drugs to eliminate the characteristic signs and symptoms of mental illness, especially schizophrenia, may render mental patients docile and unlikely to engage in violent or bizarre behaviors while they are institutionalized, but it does not "cure" them or allow them to demonstrate that they would remain nonviolent if they were not drugged. See American Psychiatric Assn., Statement on the Insanity Defense 15–16 (1982). At petitioner's May 1976 hearing, the Government relied on testimony that petitioner was "not always responsive in a positive way to what goes on" and was "not a very active participant in the informal activities on the Ward" to support its contention that he had not recovered. See Tr. 7–9. The amount of medication he was receiving, however, made it unlikely he could be an active participant in anything. See n. 19, *infra*.

*e. g., Mathews* v. *Eldridge,* 424 U. S., at 335; *Stanley* v. *Illinois,* 405 U. S. 645, 657–658 (1972); *Bell* v. *Burson,* 402 U. S. 535, 542–543 (1971). There are many ways to take into account criminal behavior and past mental condition, and thereby to vindicate the government's legitimate interest in accurate commitment decisions, without depriving insanity acquittees of the *Addington* protections. Certain aspects of the District of Columbia's commitment procedures already embody less restrictive alternatives: all insanity acquittees are committed automatically for 50 days before an initial release hearing, § 24–301(d), and the testimony of mental health professionals at all hearings may be informed by their experience with mentally ill patients and by their familiarity with current research. The fact of an insanity acquittal and the evidence on insanity adduced at trial are clearly admissible in all commitment and release hearings.

In addition, an insanity acquittal might conceivably justify commitment for a reasonably limited period without requiring the Government to meet its *Addington* burden. See *United States* v. *Brown,* 155 U. S. App. D. C. 402, 408, 478 F. 2d 606, 612 (1973); American Psychiatric Assn., Statement on the Insanity Defense 15 (1982); cf. *Jackson* v. *Indiana,* 406 U. S., at 738; *McNeil* v. *Director, Patuxent Institution,* 407 U. S. 245, 249 (1972). In this case, petitioner submits that such a reasonable period extends no longer than the maximum sentence that could have been imposed had he been found guilty of the crime charged. But at some point the Government must be required to justify further commitment under the standards of *Addington.*[17]

---

[17] The Court asserts that the Government has a "strong interest" in avoiding a *de novo* commitment hearing after an insanity acquittal. *Ante,* at 366. There appear to be several reasons for this. First, the Court mentions that a jury would be available at such a hearing. Petitioner, however, has not argued that the Due Process Clause requires that a jury be provided when an insanity acquittee is committed. If a jury were required in this case, it would only be because, lacking a constitutional basis to keep petitioner under confinement beyond the period he has already

4. If the Government's interests were the only ones at stake, an insanity acquittal would furnish a reasonable basis for indefinite commitment. Under the Constitution, however, the Government's interests must be considered in light of the liberty interests of the individual who is subject to commitment. In the final analysis, the Court disregards *Addington* not on the ground that the Government's interests in committing insanity acquittees are different from or stronger than its interests in committing criminals who happen to be mentally ill, or mentally ill individuals who have done violent, dangerous things, but on the theory that "there is good reason for diminished concern as to the risk of error" when a person is committed indefinitely on the basis of an insanity acquittal. See *ante*, at 367.

The "risk of error" that, according to the Court, is diminished in this context subsumes two separate risks. First, the Court notes that in *Addington* we were concerned, at least in part, that individuals might be committed for mere idiosyncratic behavior, see 441 U. S., at 427, and it observes that criminal acts are outside the "'range of conduct that is generally acceptable.'" *Ante*, at 367, quoting 441 U. S., at 426–427. *O'Connor*, however, requires that a person be proved *dangerous*, not merely "unacceptable," before he may

---

spent in jail or in St. Elizabeths, the Government had to turn to the existing civil commitment process to justify further commitment. Second, the Court apparently believes that the Government's "strong interest" extends to avoiding the "clear and convincing evidence" standard. While it might often be convenient for the Government to accord individuals fewer protections than the Due Process Clause requires, constitutional standards of due process reflect individual interests as well as governmental efficiency. See *infra*, this page and 384–386. Finally, the Court states that "the new proceeding likely would have to relitigate much of the criminal trial." *Ante*, at 366. In this case, of course, there was no criminal trial, because the Government accepted petitioner's "not guilty by reason of insanity" plea, but in any event the issues of present mental illness and dangerousness are sufficiently different from the issues raised by an insanity defense so that even if the latter were taken as settled there would still be a need for findings of fact on new issues. See *supra*, at 377–380.

be subjected to the massive curtailment of individual freedom and autonomy that indefinite commitment entails. In *Addington* itself, the State had clearly proved by a preponderance of the evidence that the petitioner had engaged repeatedly in conduct far beyond the pale of acceptable behavior, yet we did not regard that level of proof as furnishing adequate protection for the individual interests at stake.[18]

Second, the Court reasons that "[a] criminal defendant who successfully raises the insanity defense necessarily is stigmatized by the verdict itself," and therefore that committing him does not involve the same risk of stigmatization a civil commitment may entail. *Ante*, at 367, n. 16. This is perhaps the Court's most cynical argument. It is true that in *Addington* and in *Vitek* v. *Jones*, 445 U. S. 480 (1980), we recognized that individuals have an interest in not being stigmatized by society at large on account of being labeled mentally ill. 441 U. S., at 426; 445 U. S., at 492. Avoiding stigma, however, is only one of the reasons for recognizing a liberty interest in avoiding involuntary commitment. We have repeatedly acknowledged that persons who have already been labeled as mentally ill nonetheless retain an interest in avoiding involuntary commitment. See, *e. g.*, *O'Connor* v. *Donaldson*, 422 U. S., at 575; *Baxstrom* v. *Herold*, 383 U. S. 107 (1966). Other aspects of involuntary commitment affect them in far more immediate ways.

In many respects, confinement in a mental institution is even more intrusive than incarceration in a prison. Inmates of mental institutions, like prisoners, are deprived of unrestricted association with friends, family, and community;

---

[18] The jury in *Addington* had been instructed that they must find Addington mentally ill and in need of hospitalization for his own welfare and protection or for the protection of others based upon "clear, unequivocal and convincing evidence." 441 U. S., at 421. As explained above, see n. 2, *supra*, we held that proof by a preponderance of the evidence would not have been sufficient, and we remanded for a determination by the state courts whether the jury instruction given corresponded to the constitutionally required "clear and convincing evidence" standard. 441 U. S., at 433.

they must contend with locks, guards, and detailed regulation of their daily activities.   In addition, a person who has been hospitalized involuntarily may to a significant extent lose the right enjoyed by others to withhold consent to medical treatment.   See *Youngberg* v. *Romeo*, 457 U. S. 307, 321 (1982) (involuntary committee's due process right to freedom from unreasonable restraint limited to a guarantee that professional medical judgment be exercised).   The treatments to which he may be subjected include physical restraints such as straightjacketing, as well as electroshock therapy, aversive conditioning, and even in some cases psychosurgery. Administration of psychotropic medication to control behavior is common.   See American Psychiatric Assn., Statement on the Insanity Defense 15 (1982) ("Greater emphasis is now placed upon psychopharmacological management of the hospitalized person").   Although this Court has never approved the practice, it is possible that an inmate will be given medication for reasons that have more to do with the needs of the institution than with individualized therapy.[19]   See *Mills* v. *Rogers*, 457 U. S. 291, 303 (1982); *Rennie* v. *Klein*, 653 F. 2d 836, 845 (CA3 1981) (en banc).   We should not presume that he lacks a compelling interest in having the decisions to com-

---

[19] The record in this case provides a chilling example: Several months after petitioner's arrest, a psychologist at St. Elizabeths submitted a report on his mental condition to the court.   The report disclosed that petitioner was being given 400 milligrams of Thorazine (a psychotropic drug) daily, and that, in the opinion of the staff, petitioner was competent to stand trial.   See Record 48–51.   Approximately three months later, at petitioner's May 1976 hearing, Dr. Gertrude Cooper, another staff psychologist at St. Elizabeths, testified that petitioner was being given 900 milligrams of Thorazine a day at that time.   Tr. 8.   (Shortly before the hearing, however, she had submitted a report which indicated that petitioner was receiving 1,000 milligrams of Thorazine daily, plus a tranquilizer.   Record 54.)   In her own words, "this is sort of a heavy dose of medication."   Tr. 9.   None of Dr. Cooper's testimony indicates why petitioner's daily medication was more than doubled after he no longer needed to be competent to stand trial; any specific worsening of his condition would certainly have been relevant at the May hearing.

mit him and to keep him institutionalized made carefully, and in a manner that preserves the maximum degree of personal autonomy.

Therefore, I cannot agree with the Court that petitioner in this case has any less interest in procedural protections during the commitment process than the petitioners in *Addington, O'Connor,* or *Baxstrom,* and I cannot agree that the risks of error which an indefinite commitment following an insanity acquittal entails are sufficiently diminished to justify relieving the Government of the responsibilities defined in *Addington.*

C

Indefinite commitment without the due process protections adopted in *Addington* and *O'Connor* is not reasonably related to any of the Government's purported interests in confining insanity acquittees for psychiatric treatment. The rationales on which the Court justifies § 24–301's departures from *Addington* at most support deferring *Addington*'s due process protections—specifically, its requirement that the Government carry the burden of proof by clear and convincing evidence—for a limited period only, not indefinitely.

The maximum sentence for attempted petit larceny in the District of Columbia is one year. Beyond that period, petitioner should not have been kept in involuntary confinement unless he had been committed under the standards of *Addington* and *O'Connor.* Petitioner had been in custody for 17 months at the time of his February 1977 hearing, either in St. Elizabeths or in the District of Columbia Correctional Center. At that time he should have received the benefit of the *Addington* due process standards, and, because he did not, the findings at that hearing cannot provide constitutionally adequate support for his present commitment. I would therefore reverse the judgment of the District of Columbia Court of Appeals.

JUSTICE STEVENS, dissenting.

The character of the conduct that causes a person to be incarcerated in an institution is relevant to the length of his permissible detention. In my opinion, a plea of not guilty by reason of insanity, like a plea of guilty, may provide a sufficient basis for confinement for the period fixed by the legislature as punishment for the acknowledged conduct, provided of course that the acquittee is given a fair opportunity to prove that he has recovered from his illness. But surely if he is to be confined for a longer period, the State must shoulder the burden of proving by clear and convincing evidence that such additional confinement is appropriate. As JUSTICE BRENNAN demonstrates, that result is dictated by our prior cases. What JUSTICE POWELL has written lends support to the view that the *initial* confinement of the acquittee is permissible, but provides no support for the conclusion that he has the burden of proving his entitlement to freedom after he has served the maximum sentence authorized by law. I respectfully dissent because I believe this shoplifter was presumptively entitled to his freedom after he had been incarcerated for a period of one year.