[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On January 10, 2001, Jennifer Bucci was found not guilty by reason of CT Page 14758 mental disease of the crimes of attempted murder in violation of §§53a-49 and 53a-54a, assault in the first degree in violation of §53a-59 (a)(1) and risk of injury in violation of § 53-21 (1).
Pursuant to General Statutes § 17a-582 (a), the court committed Bucci to the custody of the Commissioner of Mental Health and Addiction Services for an examination to determine her mental condition. By report dated March 15, 2001 (CVH report), the director of Connecticut Valley Hospital, Whiting Forensic Division[1], filed his findings and conclusions as to whether Bucci is a person who should be discharged. Thereafter, on March 22, 2001, counsel for Bucci filed a notice of intent to have Kenneth M. Selig, M.D. perform a separate examination of Bucci. On August 28, 2001, the hearing commenced and continued to proceed on September 6, 19, October 3, and concluded on October 17, 2001.
In the CVH report of March 15, 2001, the director concluded that Bucci would be a danger to the public if released. He further recommended that Bucci should be committed to the jurisdiction of the Psychiatric Security Review Board (PSRB) for a "period of time seen fit to be set by the court." Finally, he recommended that Bucci be returned for placement at the maximum security setting of the Whiting Forensic Division of Connecticut Valley Hospital.
Under § 17a-582 (f), at the hearing before the court, it is the acquittee Bucci who has the burden of proving by a preponderance of the evidence that she is a person who should be discharged. In this hearing the acquittee called Mark Cotterell, M.D., one of the signers of the CVH report and Kenneth M. Selig, M.D., J.D., the psychiatrist who examined her pursuant to § 17a-582 (e). The state called no witnesses.
The court is to "make a finding as to the mental condition of the acquittee, and, considering that its primary concern is the protection of society," order the commitment of the acquittee to the jurisdiction of PSRB or order that the acquittee be discharged from custody. The legislature has included the following definitions to guide the court in its determination:
 (11) "Person who should be discharged" means an acquittee who does not have psychiatric disabilities or is not mentally retarded to the extent that his discharge would constitute a danger to himself or others.
General Statutes § 17a-580 (11). CT Page 14759
Thus, it is this court's role to determine if Jennifer Bucci has met her burden to prove that she does not have psychiatric disabilities to the extent that her discharge would constitute a danger to herself or others. In conducting this hearing and rendering a decision on the acquittee's application the court is guided by the established law regarding the commitment of acquittees in Connecticut.
 As a general matter, the confinement of insanity acquittees, although resulting initially from an adjudication in the criminal justice system, is not "punishment" for a crime. "The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness. The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous . . . As he was not convicted, he may not be punished. His confinement rests on his continuing illness and dangerousness." Jones v. United States, 463 U.S. 354, 368-69, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983).
Connelly v. Commissioner of Correction, 258 Conn. 374, 387 (2001), quoting
Payne v. Fairfield Hills Hospital, 215 Conn. 675, 683-84 (1990).[2]
There is no dispute that Bucci suffers from psychiatric disabilities, including major depression, in remission, and a substance induced psychotic disorder with delusions. Dr. Cotterell testified to a reasonable degree of medical probability that the depression would reoccur. See § 17a-580 (7) ("Mental illness includes any mental illness in a state of remission when the illness may, with reasonable medical probability, become active."). Accordingly, the court moves to the issue of dangerousness.
The Connecticut Supreme Court has addressed the determination of dangerousness in similar contexts. In State v. Gates, 198 Conn. 397, 403
(1986), the court noted,
 Predictions of future dangerousness are difficult for both psychiatrists and the courts to make because of the "inherent vagueness of the concept itself;" and such determinations must be dealt with by trial courts to a considerable extent on a case-by-case basis.
Moreover, in State v. Putnoki, 200 Conn. 208, 221 (1986), the Supreme CT Page 14760 Court discussed the trial court's use of expert testimony in reaching a decision about dangerousness:
 [T]he determination of dangerousness in the context of a mental status hearing reflects a societal rather than a medical judgment, in which the rights and needs of the defendant must be balanced against the security interests of society. The "awesome task" of weighing these two interests and arriving at a decision concerning release rests finally with the trial court.
 Although psychiatric testimony as to the defendant's condition may form an important part of the trial court's ultimate determination, the court is not bound by this evidence. It may, in its discretion, accept all, part, or none of the experts' testimony. In reaching its difficult decision, the court may and should consider the entire record available to it, including the defendant's history of mental illness, his present and past diagnoses, his past violent behavior, tile nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released.
[Citations omitted]
The court heard conflicting testimony on this issue. Dr. Cotterell testified that, notwithstanding the lack of violent acts in her past and since January 18, 2000, Bucci would be a danger to the public if released. He explained this conclusion to the acquittee's counsel,
 Ms. Bucci carried out a near fatal attack upon her daughter. And the dangerousness of that action requires that this team, in accordance with our duties under the statute, seek to understand what needs to happen in terms of her treatment, management, her care, her custody, in order to be reasonably assured that such dangerous actions will not be repeated in the future. We did not at the time of this report, nor do we at the time of my testimony, have a sufficient understanding of Ms. Bucci's condition, nor do we have a sufficient treatment alliance with her to allow us to recommend either to this court or to the Psychiatric Security Review Board should she be CT Page 14761 committed to their care, we do not have enough evidence nor do we have enough cooperation from her in her treatment in order to be sure that we can appropriately protect people from recurrence of her violent actions.
(August 28, 2001 tr. pp. 11-12).
Later, when questioned by the state's attorney, Dr. Cotterrell testified that there continue to be risk factors in Bucci's life that were considered in the team's conclusion. Those risk factors are her predisposition to depression, her history of substance abuse and dependence and issues surrounding her relationship with her daughter Brea.[3] Dr. Cotterrell concluded that Bucci should not be discharged from all supervision, monitoring and required treatment.
Dr. Selig, on the other hand, most emphatically testified that Bucci should be discharged. In his report of August 13, 2001, page 4, he states,
 In conclusion, given the fact that Ms. Bucci has never before been arrested and has never before been violent and has never before been a danger to herself or others, and given the fact that this incident was the result of medication being prescribed to her, it is clear that she can be discharged at this time without anymore likelihood that she would be dangerous to others or herself than anyone else in the general population.
During his testimony he concluded that the psychosis suffered by Bucci in January 2000 was caused by the amphetamine like substance, phentermine, which she was taking along with a number of other prescribed medications. While Bucci continues to suffer from depression, Dr. Selig opined that this depression alone would not lead to the paranoid delusional psychosis that resulted in the attempt to kill her daughter and herself. He characterized Bucci's condition on January 18, 2000, as a classic but rare temporary insanity case.
The court considered both psychiatrists' testimony along with the reports and exhibits filed in this proceeding. It also reviewed its notes and findings from the trial leading to the January 10, 2001 acquittal. All of this evidence is weighed and examined in light of the applicable statutory and case law. There is no dispute between the psychiatrists that Bucci needs treatment for her major depression. There is no dispute that she suffered from substance dependence if not abuse. In fact, Dr. CT Page 14762 Selig's first report of 10/06/00 (p. 39) states,
 The most important question in this case is whether Jennifer's mental state on January 18, 2000 was the product of a psychiatric illness, Major Depression, Severe, Recurrent, With Psychotic Features, as a result of her chronic back pain, the death of her father, and other stresses that she was under or whether her mental state was the product of involuntary intoxication because of the numerous powerful medications that she was being prescribed (and pharmacy records indicate was taking as prescribed). She was taking large does of opiate medication, including Oxycontin and Norco. Both of these have significant side effects, including side effects on mental state, including impairment of mental performance, anxiety, fear, and mood changes. Combined with the Phentermine that she was taking, which is an amphetamine-like substance and can cause psychosis, as well as the benzodiazepines that she was taking, I cannot completely rule out the fact that her mental state on January 18, 2000 was the product of the interaction of all of these medications.
 Jennifer had been under considerable stress for an extended period of time and yet there is no evidence in her history that she had ever before been psychotic. She was on more medication as of this period of time, from a number of different doctors, the interactions of which are unpredictable, such that involuntary intoxication having produced a psychotic mental state cannot be ruled out, but would require further exploration with an expert in pharmacology, such as Dr. James O'Brian at Hartford Hospital, if her defense chose to pursue this.
While the acquittee's counsel argues that the stressors that would contribute to her dangerousness have essentially been eliminated, the court disagrees. Bucci still suffers from a chronic and painful back condition and depression, and while her parental rights to Brea have been terminated, that recent judicial determination must naturally raise some emotional if not psychological issues for Bucci, Further, as to Dr. Selig's conclusion that Bucci's delusional psychosis was caused by her use of phentermine, there was no conclusive evidence (chemical tests or otherwise) of her use at the time of the offense. CT Page 14763
Finally, the court notes the following language from Jones v. UnitedStates, 463 U.S. 354, 364 (1983): "The fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness." The horrifying act of violence was committed less than two years ago. Since the judgment of acquittal nine months ago, the acquittee has not undergone a complete treatment program. This court cannot release Bucci into the community without supervision to ensure the necessary treatment and without a sufficient understanding of what led to the violence on January 18, 2000.
Because the acquittee has not met her burden to prove that she is a person who should be discharged and because this court's primary concern is the protection of society, the court finds that Bucci is a person who should be confined and accordingly orders that the acquittee be committed to the jurisdiction of the Psychiatric Security Review Board for a maximum term of twenty five years. Under General Statutes § 17a-599, the court must determine whether Bucci is so violent as to require confinement under conditions of maximum security. Based upon the entire record in this case, the court finds that Bucci is not so violent as to require confinement under conditions of maximum security.
The court hereby and in open court advises the acquittee that she has the right to a hearing before the PSRB within ninety days of this order to review her status, that is her mental condition.
DiPentima, J.