[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On October 25, 1991, Dawn March was found not guilty by reason of mental disease or defect of the charge of manslaughter in the first degree as set forth in General Statutes § 53a-55 (a)(2).[1] The criminal act she committed resulted in the death by drowning of her six month old daughter Shawna March. Dawn March was committed to the custody of Psychiatric Security Review Board (PSRB) for a period not to exceed twenty years for care, custody and treatment.
By application dated May 16, 2000, Dawn March applied for a discharge from the jurisdiction of the PSRB under the authority of General Statutes §§ 17a-593 and 17a-580 (11). The PSRB held hearings July 14, 2000 and September 8, 2000 on the application for discharge. By report dated October 30, 2000, the PSRB reported to this court that the board was tied three to three in its recommendation. See § 17a-593 (d). Three of the board members concluded that Dawn March should be discharged as follows:
 This opinion is based on these Board members' finding of fact based on the evidence presented at the hearing that Ms. March has demonstrated clinical stability over the course of her conditional release since 1996. Further, there is a finding that she has not exhibited any discernable symptoms of a mental illness for a significant number of years, and that she has made progress in treatment as it relates to developing more internal and social skills in dealing with stress and interpersonal relationships. This CT Page 5254 recommendation for the discharge of Ms. March is based on the opinion that although Ms. March could clinically benefit from ongoing treatment to support and help her interact with her environment, which is difficult for her at times, due to her personality disorder; public safety, at this point in time, does not require involuntary supervision or treatment, and that without such mandatory treatment, she would not pose a risk to herself or others.
(PSRB Report to Court Dated 10/30/200 at 4.)
The remaining three board members concluded against discharging Dawn March:
 This opinion is that although Ms. March has remained clinically stable and compliant with her conditional release, that until very recently her conditional release was a very highly structured, supervised, intensive treatment intervention program. This conditional release program has not allowed for adequate assessment of whether Ms. March can maintain the same level of clinical stability and compliance with societal norms at a lower level of treatment interventions, which would be available at the level one would receive as a voluntary client in the community without Board- ordered mandated oversight. The intensity of services provided to acquittees under the jurisdiction of the Board is not available to the average citizen. This opinion, not recommending discharge at this point in time, is based on the finding that there is not adequate data to show that Ms. March would not be a danger to herself or others if not under the jurisdiction of the Psychiatric Security Review Board. This type of data would be gathered and assessed over a period of time as the involuntary interventions and intensity of supervision, as ordered by the Psychiatric Security Review Board, are decreased.
Id., 4-5.
This court began a hearing pursuant to subsection (f) of § 17a-593
on February 14, 2001. On February 22, 2001, the parties appeared for the continuation of testimony but at the request of the acquittee and over the objection of the state, the court continued the hearing to March 22, 2001. The hearing concluded on March 23, 2001. The parties submitted post CT Page 5255 trial memoranda and the court heard argument on April 3, 2001.
Under § 17a-593 (f), at the hearing before the court, it is the acquittee who has the burden of proving by a preponderance of the evidence that she is a person who should be discharged. Here, the acquittee called Frank Stoll, Ph.D, a psychologist, Peter Zeman, M.D., a psychiatrist, and Em Leavitt-Smith, a psychiatric social worker and Dawn March's case manager and conditional release supervisor. The state called Donald Grayson, M.D., a psychiatrist. In addition, the court reviewed a large number of exhibits that documented the initial court proceedings from September 1989 to the files of the PSRB throughout Dawn March's ten year confinement under PSRB jurisdiction.
Under General Statutes § 17a-593 (g), after the hearing, the court "shall make a finding as to the mental condition of the acquittee, and, considering that its primary concern is the protection of society" either order the dismissal of the acquittee's motion for discharge or order the acquittee discharged from custody.
The statute governing the psychiatric security review board's jurisdiction includes the following pertinent definitions:
 (10) "Person who should be confined" means an acquittee who has psychiatric disabilities or is mentally retarded to the extent that his discharge or conditional release would constitute a danger to himself or others and who cannot be adequately controlled with available supervision and treatment on conditional release;
 (11) "Person who should be discharged" means an acquittee who does not have psychiatric disabilities or is not mentally retarded to the extent that his discharge would constitute a danger to himself or others;
General Statutes § 17a-580 (10) and (11).
The term "acquittee with psychiatric disabilities" has been substituted for the term "mentally ill acquittee." See General Statutes § 17a-458a
(b). During the hearing the state relied upon the following statutory definition of a person with psychiatric disabilities:
 "Persons with psychiatric disabilities" means those persons who are suffering from one or more mental disorders as defined in the most recent edition of the CT Page 5256 American Psychiatric Association's "Diagnostic and Statistical Manual of Mental Disorders."
General Statutes § 17a-458 (a).
In conducting this hearing and rendering a decision on the acquittee's application the court is guided by the established law regarding the commitment of acquittees in Connecticut.
 As a general matter, the confinement of insanity acquittees, although resulting initially from an adjudication in the criminal justice system, is not "punishment" for a crime. "The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness. The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous. . . . As he was not convicted, he may not be punished. His confinement rests on his continuing illness and dangerousness." Jones v. United States, 463 U.S. 354, 368-69, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983).
Payne v. Fairfield Hills Hospital, 215 Conn. 675, 683-84 (1990)
Before this court, both Dr. Zeman, on behalf of the acquittee, and Dr. Grayson, the state's witness, testified that in their opinion as psychiatrists, Dawn March is not mentally ill and there is not more than a minimal risk that she would be a danger to herself or others. Both psychiatrists relied heavily on the findings of Dr. Stoll who performed a psychological evaluation on Dawn March on December 15, 1999. In his report dated January 5, 2000, Dr. Stoll concluded that Dawn March has a severe personality disorder. He testified from that report before this court more than a year later. Drs. Zeman and Grayson agree with Dr. Stoll's diagnosis, also opining that the Axis I diagnosis of major depression, disassociative episode, onset postpartum is in remission and likely to remain so, to a reasonable degree of medical probability. The records of the PSRB entered into evidence reveal a course of treatment that focused on the acquittee's personality disorder. Em Leavitt-Smith testified that Dawn March has made significant progress in her treatment, but requires further treatment. Dr. Zeman agrees that Dawn March needs further treatment. Dr. Zeman and Dr. Stoll opine that Dawn March should be discharged from PSRB supervision. Dr. Grayson, the state's witness, also opines that further commitment was not justified although a weaning process would be preferable. He testified, however, that discharge would CT Page 5257 be appropriate if the current evaluation results warrant it. Thus, with this limited caveat by Dr. Grayson, the testimony of the medical and psychological experts supported the acquittee's application.
The expert opinion, as impressive as it is, is not this court's only consideration. There is applicable U.S. Supreme Court as well as Connecticut law that this court must consider in its determination. Of particular significance here is the U.S. Supreme Court's decision inFoucha v. Louisiana, where the acquittee was not mentally ill but suffered from a personality disorder for which there was no treatment.
 Here, in contrast, the State asserts that, because Foucha once committed a criminal act and now has an antisocial personality that sometimes leads to aggressive conduct, a disorder for which there is no effective treatment, he may be held indefinitely. This rationale would permit the State to hold indefinitely any other insanity acquittee not mentally ill who could be shown to have a personality disorder that may lead to criminal conduct. The same would be true of any convicted criminal, even though he has completed his prison term. It would also be only a step away from substituting confinements for dangerousness for our present system, which, with only narrow exceptions and aside from permissible confinements for mental illness, incarcerates only those who are proved beyond reasonable doubt to have violated a criminal law.
Foucha v. Louisiana, 504 U.S. 71, 82-83 (1992).
Notwithstanding the acquittee's reliance on this language to support her argument that she is not mentally ill, the court does not readFoucha to require the granting of this application.[2] The court is guided by the clear language of the Connecticut statute, General Statutes § 17a-458, defining "person with psychiatric disabilities" to include a person with a mental disorder such as a severe personality disorder. The testimony from the witnesses was that Dawn March suffered from a mental disorder as defined in the Diagnostic Manual. Further, the following language from a case decided subsequent to Foucha guides this court in considering the medical testimony.
 [T]he term "mental illness" is devoid of any talismanic significance. Not only do "psychiatrists disagree widely and frequently on what constitutes mental illness," Ake v. Oklahoma, 470 U.S. 68, 81(1985), but the Court itself has used a variety of CT Page 5258 expressions to describe the mental condition of those properly subject to civil confinement. See, e.g., Addington, 441 U.S., at 425-426 (using the terms "emotionally disturbed" and "mentally ill"); Jackson, 406 U.S., at 732, 737 (using the terms "incompetency" and "insanity"); cf. Foucha, 504 U.S., at 88
(O'CONNOR, J., concurring in part and concurring in judgment) (acknowledging State's authority to commit a person when there is some medical justification for doing so").
 Indeed, we have never required State legislatures to adopt any particular nomenclature in drafting civil commitment statutes. Rather, we have traditionally left to legislators the task of defining terms of a medical nature that have legal significance. Cf. Jones v. United States, 463 U.S. 354, 365, n. 13 (1983). As a consequence, the States have, over the years, developed numerous specialized terms to define mental health concepts. Often, those definitions do not fit precisely with the definitions employed by the medical community. The legal definitions of "insanity" and "competency," for example, vary substantially from their psychiatric counterparts. See, e.g., Gerard, The Usefulness of the Medical Model to the Legal System, 39 Rutgers L. Rev. 377, 391-394 (1987) (discussing differing purposes of legal system and the medical profession in recognizing mental illness). Legal definitions, however, which must "take into account such issues as individual responsibility . . . and competency," need not mirror those advanced by the medical profession. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders xxiii, xxvii (4th ed. 1994).
Kansas v. Hendricks, 521 U.S. 346, 359 (1997).
In that decision the Supreme Court also noted that the Kansas statute linked the finding of dangerousness to the mental abnormality. Similarly, our statute requires a finding that the acquittee has psychiatric disabilities to the extent that discharge would constitute a danger. See General Statutes § 17a-580 (10).
Having found that the acquittee has psychiatric disabilities, the court turns to the issue of dangerousness. Again, the three evaluators testified that she is of minimal or negligible risk to be dangerous to CT Page 5259 herself or others. The Connecticut Supreme Court has addressed the determination of dangerousness in similar contexts. In State v. Gates,198 Conn. 397, 403 (1986), the court noted,
 Predictions of future dangerousness are difficult for both psychiatrists and the courts to make because of the "inherent vagueness of the concept itself," and such determinations must be dealt with by trial courts to a considerable extent on a case-by-case basis.
Moreover, in State v. Putnoki, 200 Conn. 208, 221 (1986), the Supreme Court discussed the trial court's use of expert testimony in reaching a decision about dangerousness:
 [T]he determination of dangerousness in the context of a mental status hearing reflects a societal rather than a medical judgment, in which the rights and needs of the defendant must be balanced against the security interests of society. . . . The "awesome task" of weighing these two interests and arriving at a decision concerning release rests finally with the trial court. . . .
 Although psychiatric testimony as to the defendant's condition may form an important part of the trial court's ultimate determination, the court is not bound by this evidence. . . . It may, in its discretion, accept all, part, or none of the experts' testimony. . . . In reaching its difficult decision, the court may and should consider the entire record available to it, including the defendant's history of mental illness, his present and past diagnoses, his past violent behavior, the nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released.
(Citations omitted.)
In addition to its reliance on the expert testimony of the witnesses, the court has considered the entire record which includes the acquittee's psychiatric history which shows significant progress through treatment; her past diagnosis of an Axis I clinical disorder; her present diagnosis of that disorder in remission and an Axis II severe personality disorder; her lack of violent behavior for twelve years; the nature of and circumstances surrounding her criminal conduct in killing her infant CT Page 5260 child; her current inability to bear children; her need for continued therapy and the likelihood of any supervision upon her release from PSRB jurisdiction.[3] It also considered the recent events of Dawn March's dishonesty to her therapists about her renewed relationship with a man who was physically abusive to her and who is now incarcerated for other reasons.
What leads this court to conclude that the acquittee has psychiatric disabilities to the extent that discharge would constitute a danger toherself or others is that after more than four years of conditional release and during the pendency of this proceeding, on March 16, 2001, that conditional release was revoked and the acquittee returned to confinement. It is the timing and nature of the underlying behavior that raise concerns of dangerousness. In its decision revoking that conditional release, the PSRB found the following:
 Based on the evidence in the record, the Board finds as fact that Dawn March continues to have a psychiatric disorder, a severe personality disorder which, at this point in time, `is believed to have caused her to be non-disclosing and dishonest with her treaters concerning the violations of her conditional release order. Further, the Board finds the fact that CRMHC cannot adequately monitor Dawn March's compliance with conditional release at this point in time, due to the lack of disclosure and trust between Ms. March and her treaters, and CRIMHC's inability to closely monitor Ms. March concerning conditions of her conditional release, all of which are dependent upon her being forthcoming and honest with her treaters.
 Further, the Board finds that, based on Ms. March's refusal to submit to a psychological evaluation at CVH, even though upon advice of counsel, it is impossible to conduct an appropriate forensic assessment at this time. Due to the lack of a risk assessment by forensic mental health professionals, an adequate plan for the community treatment and supervision of Ms. March cannot be developed, which plan would ensure that Ms. March would not pose a risk to herself or others. Further, the Board finds as fact that there is no apparent conflict of interest that would compromise a psychological evaluation by the CVH psychologist.
 Based on Ms. March's violation of her conditional CT Page 5261 release and her re- engagement in a relationship with a person who had abused her in the past, the Board finds that Ms. March requires more intensive psychiatric treatment than she had been receiving during her conditional release. The Board finds as fact that Ms. March, based on her mental disorder, which led her to violate her conditional release and to conceal her behavior from her treaters, demonstrating her lack of engagement in treatment, would currently pose a danger to herself or others if treated or supervised in the community.
(Joint Exhibit 3; PSRB Memorandum of Decision dated March 16, 2001, at 4.)
The board ultimately concluded that the acquittee should be confined because "she has a psychiatric disability that constitutes a danger to herself or others that cannot be adequately supervised and monitored in the community at this time." Id. This conclusion was reached by the same board that six months ago could not agree that the acquittee was either a person who should be discharged or a person who should be confined.
Whether these latest events in Dawn March's life signify simply a small setback in her continuing progress towards mental health must be determined at a later date.
Because this court's primary concern is the protection of society and because the acquittee has failed to meet her burden of proving that she is a person who should be discharged, the application is denied.
DiPentima, J.