COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Malveaux and Causey
Argued by videoconference

PUBLISHED

NIGEL ELLIOT WALKER

v.      Record No. 0464-22-2

COMMONWEALTH OF VIRGINIA

OPINION BY
CHIEF JUDGE MARLA GRAFF DECKER
JULY 18, 2023

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Phillip L. Hairston, Judge

Catherine French Zagurskie, Chief Appellate Counsel (Virginia
Indigent Defense Commission, on briefs), for appellant.

Matthew P. Dullaghan, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.

Nigel Elliot Walker was acquitted of murder on a defense of not guilty by reason of

insanity under Code § 19.2-182.2. On appeal, he challenges a decision of the circuit court

denying his request to modify his conditional release plan under Code §§ 19.2-182.7 and -182.11

to allow him to live independently. We hold that the circuit court did not abuse its discretion by

refusing to modify the plan. Accordingly, we affirm the circuit court's judgment.[1]

---

[1] Portions of both the record and the briefs in this matter are sealed. Nonetheless, this
appeal necessitates unsealing relevant material for purposes of resolving the issue raised.
Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record [and
briefs], we unseal only those specific facts, finding them relevant to the decision in this case.
The remainder of the previously sealed record [and briefs] remains sealed." *Levick v.
MacDougall*, 294 Va. 283, 288 n.1 (2017).

BACKGROUND[2]

In April 2016, the appellant killed his former girlfriend's father without provocation by choking him and stabbing him in the neck with a knife. He was charged with first-degree murder and use of a weapon in the commission of a felony. In January 2017, following a sanity evaluation, the circuit court accepted his plea of not guilty by reason of insanity (NGRI) and ordered him committed to Central State Hospital. Upon yearly review, his commitment was renewed in 2018 and 2019.

In March 2020, Central State Hospital and the Richmond Behavioral Health Authority (RBHA) developed a conditional release plan for the appellant that involved his moving to the affiliated Gateway Homes, a transitional living facility. The plan included frequent psychiatric monitoring, substance abuse screening, and therapy. It also provided that the appellant's daily mental health medications would be dispensed by facility staff. Following an October 2020 hearing, the court approved the plan permitting the appellant to reside at Gateway, but at the request of the Commonwealth's Attorney, it prohibited him from leaving Gateway's premises unless accompanied by a staff member. The appellant began living at Gateway Homes on a fulltime basis in December 2020.

---

[2] Under the applicable standard of review, this Court considers the evidence in the light most favorable to the Commonwealth, as the prevailing party below. *See Lotz v. Commonwealth*, 277 Va. 345, 349 (2009) (applying this standard on review of a conditional release ruling under the sexually violent predator statutes); *see also Mercer v. Commonwealth*, 259 Va. 235, 240, 242-43 (2000) (recognizing the appellate deference owed to the circuit court's factual findings under Code §§ 19.2-182.3 and -182.5 regarding whether the defendant's diagnosed disorders were mental illnesses).

In July 2021, the court continued the appellant's conditional release on the same terms. In December 2021, with the consent of the Commonwealth, the court permitted him to visit family in Georgia for two weeks.[3]

In January 2022, following the appellant's successful return from his furlough, the RBHA issued a new report recommending that the appellant be permitted to "live[] independently" in an apartment in the community.[4] At a hearing on the recommendation, the Commonwealth relied on the evidence in the record and cross-examined the witnesses called by the appellant.

I. Evidence in the Record of the Appellant's Mental Health History and the Killing

The appellant's mother was a paranoid schizophrenic, and the appellant himself began experiencing auditory hallucinations and paranoia by age ten. After getting his GED and spending six years in the military, including serving in combat zones, he was diagnosed with posttraumatic stress disorder (PTSD). The appellant was hospitalized several times for mental health issues. He was diagnosed with major depressive disorder, as well as marijuana and alcohol abuse. Paranoid schizophrenia was suspected, and he was prescribed numerous medications, including antipsychotics. During that time period, he "was supposed to be on Depakote," but he reported that he "didn't like taking it" and "didn't take his medication consistently."

---

[3] The order directed that the appellant would "continue to take all medications as prescribed during th[at] time" and "contact" Gateway "daily to confirm medication compliance." The appellant checked in with Gateway staff as required and returned as scheduled. His check-ins occurred by phone and, therefore, permitted only verbal confirmation of his medication compliance.

[4] The report contained blocks for the signatures of the staff member who completed the report and the NGRI coordinator. The licensed clinical social worker who prepared the report signed it digitally. However, the NGRI coordinator, listed as a doctor of psychology, did not sign the report, despite the preprinted statement on the report that "[i]f the individual completing this report is *not* the . . . NGRI Coordinator[,] then *both* signatures are required." No evidence in the record establishes the reason for the missing signature.

In August 2015, the appellant, who was living in Georgia, vandalized a convenience store display, stole beer and cigarettes, removed all of his clothing, and confronted a police officer. He was arrested for disorderly conduct, shoplifting, criminal trespass, and public indecency. Shortly afterward, he relocated to Richmond, Virginia.

In September 2015 in Richmond, the appellant was evaluated by a psychiatrist at the Veterans Administration Hospital (VA). The psychiatrist noted the "severity of [the appellant's] symptoms," which she described as "highly suggestive" of either schizophrenia or schizoaffective disorder. Based on the appellant's "adamant" statements "that he d[id]n't want to harm anyone," she "assessed [him] as not an acute imminent risk to [him]self or others." The psychiatrist diagnosed him with PTSD and "[u]nspecified psychosis," prescribed medications, and recommended increased outpatient follow-up.

During that time period, the appellant was dating Emily Szabo, a Richmond resident. He located housing and had several jobs, but he either quit or was fired from each of the jobs. Emily ended her romantic relationship with the appellant in early 2016, but she and her parents allowed him to live with them temporarily so that he would not be homeless. They described the appellant as "exhausted" and "drifting."

In March 2016, Emily's mother encouraged the appellant to go to the VA because he "didn't seem to be making progress" and in fact exhibited "a slide in his functioning." He also had informed her that he did not always take his necessary medication because "he didn't like how it made him feel."

Shortly thereafter, on March 29, the appellant returned to the VA for the first time in more than five months. He reported that he had "tried" the antipsychotic medication prescribed for him the previous September "but it was too sedating." He further stated that he did not contact his VA psychiatrist, despite her previous recommendation for "increased follow-up,"

- 4 -

because he was "trying to take care of everything on his own." The psychiatrist noted that the appellant's "[i]mpaired reality testing and suspicions about a larger conspiracy . . . necessitate[d] a . . . diagnosis of unspecific psychosis," and she prescribed a new antipsychotic medication. She opined, however, that he had "fair judgment, good insight," and "intact impulse control." She also noted that she did not detect any "suicidal or homicidal ideation."

The appellant reported increased difficulty with nightmares on the new medication. On April 1, his third day taking the medicine, he went to a restaurant with Emily and her mother. The appellant thought that others in the restaurant were sending him coded messages, could hear his thoughts, and intended to hurt him or his companions, and he said he "felt violent."[5]

Later that evening, the appellant's anger seemed to have subsided, but he was described as being "not fully there." Later still, he received a message that his grandmother had died. For several hours, he exhibited a variety of emotions and erratic behaviors. Then, sometime in the early hours of April 2, without warning, he ran into Emily's father's bedroom, where he choked and stabbed Mr. Szabo, killing him. The appellant later told his psychiatrist that he felt that he was "back in Afghanistan" on a "government mission" requiring him to kill the man. All witnesses said that the killing was not preceded by any sort of confrontation between the appellant and the victim.

## II. The Appellant's Post-Killing Treatment and Assessments

In April 2016, between the time of the appellant's arrest and his sanity evaluation, a physician at the jail where he was incarcerated observed that he was aggressive and unpredictable and reported "hearing voices" and "feel[ing] paranoid." The doctor also indicated that the appellant had not been taking his medications regularly and "could not give any reason

---

[5] The appellant's psychiatrist later characterized those symptoms as paranoia and hypervigilance.

for skipping" them. In early 2017, as noted, he was found not guilty by reason of insanity and committed to Central State Hospital.

In December 2019, before the circuit court approved the appellant's move from Central State Hospital to Gateway Homes, Dr. Helen Greenbacker, a licensed clinical psychologist, prepared a risk analysis report. Dr. Greenbacker recommended that discharging the appellant to a "structured group home setting" would permit continued monitoring of his stability in a "less restrictive environment." She noted that the appellant could reside in Gateway's supported living center with "24 hour services, including medication administration and monitoring." Greenbacker recommended "ongoing medication management," "monitoring [for] . . . changes in mental status," and limiting "unstructured time" to reduce the risk that the appellant would return to substance abuse and criminal behavior.

In a subsequent review in October 2020, the facility's treatment plan for the appellant included frequent psychiatric monitoring, ongoing substance abuse screening, and therapy. It also provided that his daily mental health medications would continue to be dispensed by Gateway staff. Dennis Petrocelli, a staff psychiatrist, testified that the appellant was on two different medications—an antipsychotic and an antidepressant. Dr. Petrocelli explained that he could not predict *when* the appellant would "decompensat[e]" if he stopped taking those medications but that it could happen in a matter of weeks.

III. The Appellant's Evidence at the January 2022 Conditional Release Review Hearing

At the January 2022 hearing, the appellant called four witnesses who had worked with him in their capacities as employees of Gateway Homes.[6] All opined that the appellant was ready to live "independently" in the community rather than at Gateway. Additionally, his case

---

[6] The appellant also submitted letters attesting to his character.

manager stated that all team members who worked with the appellant, including his psychiatrist, had "no problem" with his living independently. The psychiatrist, however, did not testify.

The testimony established that the appellant took his medication without complaint when dispensed and complied with all other conditions imposed upon him by the court's conditional release order and Gateway Homes. The evidence further indicated that if the appellant was permitted to live in the community, he could receive ongoing support services through Gateway or the VA. The two social workers who testified, however, admitted that they could not guarantee the appellant would be successful and not stop his mental health treatment if allowed to live on his own. Further, the testimony established that if he had a mental health crisis while living at Gateway, the monitoring and supervision there would increase the odds of identifying and treating the crisis promptly.

The appellant testified in his own behalf and noted his commitment to comply with the court's orders, just as he had done during his recent trip to visit family. He explained that he had "been in college most times" during the previous year. He said that living independently would permit him to attend college on a full-time basis more easily and study in a quiet location without the disruptions of a group home. The appellant insisted that he had no interest in stopping his psychotropic medications and that if he thought they were not working properly, he would seek help at Gateway or the VA.

IV. The Parties' Arguments and the Circuit Court's Ruling

The RBHA report and counsel for the appellant noted his full compliance with the conditional release plan, his participation in online college courses, and his repeated negative drug and alcohol screens. The report further pointed to the appellant's recent success on a court-approved trip to Georgia. It recommended, in keeping with his wishes, that he be permitted to move to an apartment in the community and "live[] independently."

The prosecutor argued that compliance was easier to maintain while the appellant was "under intense supervision and monitoring" and that the court's main concern should be public safety. She emphasized that no psychiatrist had provided a current evaluation of the appellant's mental health. The prosecutor further noted that while five years had elapsed since the appellant's crime, he had been at Gateway, under a lower level of supervision, for only about thirteen months. She additionally pointed out that the appellant had not been medication compliant *prior* to killing the victim. The prosecutor emphasized that when the appellant met with one of his doctors only a few days before the killing, he denied "suicidal" or "homicidal" ideations," and the doctor opined that he had "good insight," "fair judgment," and intact "impulse control." As a result of all these things, the prosecutor asked the court to keep the existing conditional release plan in place at that time.

The court stated that although it was "not discounting anything [it had] heard from any of the witnesses," including the appellant, it was "mindful" of the "unprovoked" killing he committed. It mentioned the concern that the appellant could reoffend and that it had to consider "community safety." The court declined the request to modify the plan but said it would review the plan again in six months. It entered an order embodying its ruling on February 24, 2022, and the appellant noted an appeal of that order, which is now before this Court.

ANALYSIS

The appellant suggests that the circuit court erred by failing to modify his conditional release plan to allow him to live independently.[7]

---

[7] The appellant originally also challenged the court's condition that he had to receive all treatment at Gateway and be accompanied by staff if leaving the premises for any reason. The parties represent that in circuit court proceedings subsequent to the one at issue here, the court entered an agreed order permitting the appellant to obtain treatment at the VA and to leave Gateway without an escort. We recognize the parties' diligence in bringing the issue to the Court's attention. *Cf. Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.23 (1997) ("It is the duty of counsel to bring to the federal tribunal's attention, '*without delay*,' facts that may

## I. Standard of Review

The language of the applicable statutes, the existing case law interpreting them, and analogous legal principles provide the governing standard of review for appeals involving the treatment of a defendant acquitted based on a plea of not guilty by reason of insanity.

Proceedings under Code §§ 19.2-182.2 to -182.16, the statutory scheme for addressing the disposition of persons acquitted by reason of insanity, are civil proceedings. *See, e.g.*, Code § 19.2-182.3. The text of the statutory scheme expressly grants discretion to the circuit courts applying it. Code § 19.2-182.7 indicates that the court "shall subject a conditionally released acquittee to such orders and conditions *it deems* will" balance certain enumerated interests. Code § 19.2-182.7 (emphasis added). Similarly, Code § 19.2-182.11(A) provides that "[t]he committing court *may* modify . . . or remove conditions placed on release." Subsection (B) directs that "the court *may* issue a proposed order for modification or removal of conditions" "*[a]s it deems appropriate* based on" the evidence. Code § 19.2-182.11 (emphasis added). This language makes clear that the reviewing circuit court has discretion regarding the way in which it applies the statutory scheme. *See Sauder v. Ferguson*, 289 Va. 449, 457 (2015) ("Unless it is manifest that the purpose of the legislature was to use the word 'may' in the sense of 'shall' or 'must,' then 'may' should be given its ordinary meaning—permission, importing discretion." (quoting *Masters v. Hart*, 189 Va. 969, 979 (1949))); *cf. Murry v. Commonwealth*, 288 Va. 117, 122 (2014) (applying an abuse-of-discretion standard to the review of sentencing decisions,

---

raise a question of mootness." (quoting *Bd. of License Comm'rs v. Pastore*, 469 U.S. 238, 240 (1985) (per curiam))). *See generally Palmer v. Commonwealth*, 74 Va. App. 336, 338 (2022) (discussing mootness doctrine). Consequently, in light of the posture of the case, the appellant has withdrawn his appeal of these issues, and we do not address them. *See Logan v. Commonwealth*, 47 Va. App. 168, 172 & n.4 (2005) (en banc) (recognizing that an appellate court can accept "an express withdrawal of an appellate challenge to a trial court judgment," or to a portion of it, "as a basis for not deciding [an issue]"), *cited with approval in Butcher v. Commonwealth*, 298 Va. 392, 395 (2020) (plurality opinion).

including conditions of probation). The General Assembly's use of "'[m]ay' presupposes that [the body granted discretion] also 'may not.'" *Wal-Mart Stores E., LP v. State Corp. Comm'n*, 299 Va. 57, 70 (2020), *quoted with approval in Berry v. Bd. of Supers.*, ___ Va. ___, ___ (Mar. 23, 2023). Consequently, an abuse-of-discretion standard governs the circuit court's ultimate determination regarding the appropriate conditions for release and their further review under the statutory scheme, subject to additional principles regarding review of a court's discretionary rulings.

Of course, if the circuit court committed an error of law in interpreting a statute, that error itself constitutes an abuse of discretion. *See Lynchburg Div. of Soc. Servs. v. Cook*, 276 Va. 465, 484 (2008) (citing *Porter v. Commonwealth*, 276 Va. 203, 260 (2008)). Appellate review, therefore, involves applying a de novo standard to the extent that the appellate court must assess the circuit court's construction of the applicable statutes for legal error. *See Bates v. Commonwealth*, 287 Va. 58, 61, 63, 65 (2014) (applying a de novo standard to review "whether the circuit court properly applied" the statutes addressing inpatient hospitalization and conditional release "to [the court's] findings of fact"); *see also Lawlor v. Commonwealth*, 285 Va. 187, 214 n.5 (2013) (providing that requiring de novo review of legal conclusions is not "a back door through which an appellant may convert" an abuse-of-discretion standard "into [full] de novo review").

A court also abuses its discretion when "a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; [or] when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." *Murry*, 288 Va. at 122 (alteration in original) (quoting *Landrum v. Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011)). As to these types of determinations, a court abuses its discretion "[o]nly when

reasonable jurists could not differ" as to the appropriate outcome. *Williams v. Commonwealth*, 59 Va. App. 238, 246 (2011) (quoting *Tynes v. Commonwealth*, 49 Va. App. 17, 21 (2006)). "This principle necessarily implies that, for some decisions, conscientious jurists could reach different conclusions based on exactly the same facts—yet still remain entirely reasonable." *Thomas v. Commonwealth*, 62 Va. App. 104, 111 (2013) (quoting *Hamad v. Hamad*, 61 Va. App. 593, 607 (2013)). "This bell-shaped curve of reasonability governing our appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016) (quoting *Sauder*, 289 Va. at 459).

Finally, the circuit court's factual findings are entitled to the traditional degree of appellate deference under an abuse-of-discretion standard. *C.S. v. Va. Beach Dep't of Soc. Servs.*, 41 Va. App. 557, 566 (2003); *see Mercer v. Commonwealth*, 259 Va. 235, 240-43 (2000) (in reviewing whether an individual found NGRI qualified for conditional release, recognizing that whether her disorders were mental illnesses was a factual determination for the circuit court). And it is understood that the circuit court, as the fact finder, "assess[es] the credibility of the witnesses and the probative value to be given their testimony." *Mercer*, 259 Va. at 242 (quoting *Richardson v. Richardson*, 242 Va. 242, 246 (1991)). That court's factual determinations, "like those of a jury, are binding on" the appellate court and will be reversed "'only if they are plainly wrong or without evidence to support them.'" *Id.* at 243 (quoting *Richardson*, 242 Va. at 246).

It is in light of these various principles that we review the appellant's assignment of error.

### B. Specific Terms of Conditional Release

The appellant contends that the circuit court erred by failing to allow him to live independently rather than at Gateway Homes following his acquittal of first-degree murder on a

defense of not guilty by reason of insanity. In order to address the appellant's claim, we turn to examining the more specific legal framework in light of the applicable standard of review.

A finding of not guilty by reason of insanity "excuse[s]" the accused individual "from criminal responsibility for the [charged] act because [of] his mental condition at the time of the offense." *Eastlack v. Commonwealth*, 282 Va. 120, 124 (2011). An "insanity acquittee has not been convicted of a criminal offense" and "may not be punished." *Williams v. Commonwealth*, 18 Va. App. 384, 388 (1994) (citing *Jones v. United States*, 463 U.S. 354, 369 (1983)). Nonetheless, such an acquittal does not render the acquittee "free to resume his life in the community as he would be if he had been acquitted in the usual sense." *Eastlack*, 282 Va. at 124. Instead, he must be placed in the "temporary custody of the Commissioner [of Behavioral Health and Developmental Services] for evaluation by skilled professionals." *Id.* at 123-24. The "purpose of commitment following an insanity acquittal . . . is to treat the individual's mental illness and protect him and society from his potential dangerousness." *Williams*, 18 Va. App. at 388 (quoting *Jones*, 463 U.S. at 368). Consequently, due process "requires that the nature and duration of [the] commitment" must be reasonable in "relation to [its] purpose." *Id.* (quoting *Jones*, 463 U.S. at 368). Code §§ 19.2-182.2 to -182.16 delineate the mechanism by which Virginia's courts provide this due process with regard to commitment for evaluation and treatment, as well as with regard to conditional or unconditional release.[8]

---

[8] As noted, the statutory scheme is civil. *See, e.g.*, Code § 19.2-182.3. *See generally Ballagh v. Fauber Enters., Inc.*, 290 Va. 120, 124-25 (2015) (recognizing that the preponderance standard applies to civil statutory actions unless otherwise provided); *see also Jones*, 463 U.S. at 368 ("The preponderance of the evidence standard comports with due process for commitment of insanity acquittees.").

Code § 19.2-182.7 divides a circuit court's duties into two parts. First, the court must determine whether inpatient hospitalization is necessary. Code § 19.2-182.7.[9] Here, the court determined on prior review, after almost four years of inpatient hospitalization, that conditional release of the appellant was appropriate. In the instant proceeding, both below and in this Court, neither party disputes that conditional release rather than inpatient hospitalization remains appropriate.

Second, if inpatient hospitalization is not required, the circuit court must determine what conditions should be imposed.[10] *Id.* Code § 19.2-182.7 directs that the circuit court "shall" impose "such orders and conditions" as "*it deems* will best meet the acquittee's need for treatment and supervision *and* best serve the interests of justice and society." *Id.* (emphases added); *see Bates*, 287 Va. at 66-67. In other words, the court must balance these two interests to provide appropriate treatment and supervision while both serving justice and protecting society. Once the court has set the terms for the acquittee's conditional release, the community services board or behavioral health authority, here the RBHA, "shall implement the court's conditional release orders." Code § 19.2-182.7. It must also "submit written reports to the court on the acquittee's progress and adjustment in the community" at least every six months. *Id.*

Code § 19.2-182.11(A) provides that after setting the initial conditions of release, the "committing court may modify . . . or remove conditions placed on release" under the same

---

[9] If a felony acquittee is committed for inpatient treatment, an initial hearing must be held twelve months after the date of commitment, and then a reassessment hearing "shall be conducted at yearly intervals for five years and at biennial intervals thereafter." Code § 19.2-182.5(A).

[10] Release can be "with or without conditions." *Williams v. Commonwealth*, 294 Va. 25, 26 (2017) (per curiam) (quoting Code § 19.2-182.2); *see* Code §§ 19.2-182.2 to -182.3 (noting the options and the related need for an appropriate "conditional release or discharge plan" approved by the court). The appellant requested only the modification of his conditional release plan to permit independent living. He does not suggest that he should be relieved of other conditions.

terms set out in Code § 19.2-182.7. Additionally, any party—including the supervising behavioral health authority, the attorney for the Commonwealth, or the acquittee—may petition for modification. Code § 19.2-182.11(A).[11] And in deciding whether to modify or remove conditions, the court may consider the behavioral health authority's reports and "any other evidence provided to it." Code § 19.2-187.11(A)-(B).

The appellant argues that the court erred by refusing to modify his conditional release plan because the RBHA and Gateway Homes presented evidence that he could live independently and the Commonwealth offered no evidence to the contrary, simply relying on the record and the evidence presented by the acquittee. More specifically, he contends that the court abused its discretion by giving "too much weight to the underlying offense." He also suggests that it erred by finding that public safety outweighed his evidence for modification in light of the Commonwealth's failure to introduce any new evidence that modifying the plan would pose a threat to public safety.[12]

The duty to conduct the statutorily required balancing "rest[s] heavily on [the] judge[] closest to the facts of the case—[the one] hearing and seeing the witnesses, taking into account their verbal and nonverbal communication, and placing all of it in the context of the entire case." *See Minh Duy Du*, 292 Va. at 563. Here, the circuit court was not limited to the testimony of the appellant and his witnesses. The court was statutorily required to determine whether the appellant needed inpatient hospitalization, as well as to conduct periodic review of that

---

[11] The court may also modify or remove conditions "upon its own motion." Code § 19.2-182.11(A).

[12] The appellant has not characterized his claim, in either the circuit court or this Court, as one that the circuit court misallocated the burden of proof. *See generally Muhammad v. Commonwealth*, 269 Va. 451, 523 (2005) (recognizing that a claim that the circuit court erroneously failed to apply a particular burden of proof is waivable under the contemporaneous objection rule); *Shenk v. Shenk*, 39 Va. App. 161, 169 (2002) (same). Therefore, we do not consider that question.

hospitalization and his subsequent conditional release, and the RBHA was mandated to provide scheduled progress reports. *See* Code §§ 19.2-182.2 to -182.3, -182.5, -182.7, -182.11. All of these reports—including their coverage of the circumstances surrounding the underlying offense and the appellant's mental health during all relevant time periods, including before, during, and after the offense—necessarily make up the record in this case.[13]

The transcript of the hearing makes clear that the circuit court carefully considered the evidence before it. The court stated that it did not "discount[] anything" it heard "from any of the witnesses," including the appellant. Nevertheless, it further noted that the appellant had committed an "unprovoked" killing and it was compelled to consider "community safety." The court also expressed concern that the appellant could reoffend. The evidence in the entire record, viewed under the proper standard, supports the court's specific factual findings.

In addition, the evidence as a whole supports the conclusion that the court did not abuse its discretion by refusing to alter the terms of the appellant's conditional release to allow him to live independently at that time. Dr. Greenbacker—the licensed clinical psychologist who examined the appellant before his conditional release to Gateway Homes—noted that his "psychiatric instability" had "significantly contribute[d] to" his criminal behavior. Supporting this causal connection was evidence of the appellant's criminal charges in Georgia, during which he became violent, as well as the killing in Virginia that led to his being found not guilty by reason of insanity. Dr. Greenbacker therefore opined that reducing the appellant's risk of reoffending required both the ongoing management of his prescription mental health medications and monitoring to detect changes in his mental status. During that period of time, the appellant

---

[13] The appellant did not challenge the circuit court's consideration of any of these reports below and also does not allege on appeal that the court's consideration of them was error. Instead, he argues that the circuit court "gave too much weight to the underlying offense" as compared to the most recent RBHA report and the related testimony from his witnesses.

was taking medications to control his delusions, paranoia, aggression, depression, anxiety, and PTSD. Dr. Greenbacker further concluded that he "should not be permitted to have large amounts of unstructured time" because this could lead to a return of his substance abuse problems and make it harder to detect dangerous changes in his mental health.

At the time of the hearing in January 2022, the appellant had been on conditional release and living fulltime at Gateway Homes for only about thirteen months. He had fully complied with the terms of his conditional release to Gateway, including taking his medications as directed when dispensed by facility staff. The appellant had also complied with a court order on a visit with family in another state for a period of two weeks, during which he was required to call Gateway daily to report that he had taken his medications. Further, the appellant stated an intention to continue taking his medications regularly if allowed to live independently and described the symptoms he would experience if they stopped working properly. Nonetheless, two social workers from Gateway who testified that they supported the appellant's desire to live independently in the community admitted they could not guarantee he would not stop his medications, as he had done in the past. Additionally, the evidence proved that if he had mental health issues while still residing at Gateway, the degree of supervision would increase the odds of identifying and treating the issues promptly. By contrast, if the appellant had mental health problems while living in the community, he would have to seek assistance for himself, something he had been reluctant to do in the past. And staff psychiatrist Dennis Petrocelli testified at a prior review hearing in 2020 that he could not predict *when* the appellant would "decompensat[e]" if he stopped taking his medication. Finally, despite the appellant's stated intention to keep taking his medications, the evidence established that he had not been medication compliant at various times both before and after killing the victim because he did not like how the medication made him feel. It also established that he denied any homicidal ideation

just days before he killed Mr. Szabo. This evidence showed just how difficult it was to monitor the appellant's mental health when his medication was not dispensed to him by others.

In sum, the court was required to determine, after weighing all of the evidence, what "it deem[ed would] best meet the acquittee's need for treatment and supervision *and* best serve the interests of justice and society." Code § 19.2-182.7. Based on the evidence in the record, the appellant had not previously been medication compliant because he did not like how it made him feel. A psychiatrist who prescribed antipsychotics for him had been unable to accurately determine whether he posed a significant threat to others at that time, as shown by his act of killing a man in an entirely unprovoked attack just three days later. This inability to accurately assess the appellant's condition resulted in his taking a life, not simply engaging in a mere property crime and disorderly conduct, like some of the earlier offenses he committed in 2015. On these facts, the court did not abuse its discretion in concluding that requiring the appellant to continue residing at Gateway Homes rather than allowing him to live independently best balanced both "the acquittee's need for treatment and supervision" and "the interests of justice and society." *See id.*; *cf. Bates*, 287 Va. at 61, 63, 65 (in reviewing the court's application of Code §§ 19.2-182.3 and -182.7, deferring to its findings of fact, including its evaluation of risk posed by unconditional release).

At Gateway, the appellant's medication was dispensed by staff, and his mental health could be monitored on a daily basis. By contrast, if he lived independently, he would have to manage his medication and mental health himself on a day-to-day basis. The court alluded to the provision in Code § 19.2-182.7 requiring the RBHA to submit a written report on the appellant's progress at least every six months. It indicated that it would be "happy to review the plan" again following that interval, "see [if the appellant] ha[d] continued to comply," and if so,

"consider . . . any request to . . . modify" then.[14] The court simply concluded that it was "not persuaded" that modification was appropriate "at th[at] time." In light of the conflicting evidence in the record, including the evidence regarding the appellant's mental health history and the circumstances surrounding the killing, the circuit court did not err by reaching that conclusion.

CONCLUSION

We hold that the circuit court did not abuse its discretion by refusing to modify the appellant's conditional release plan to permit him to live independently. Accordingly, we affirm the circuit court's judgment.

*Affirmed.*

---

[14] The statutory scheme requires the board or authority overseeing an acquittee's conditional release to provide a written report on his progress "no less frequently than every six months." Code § 19.2-182.7. However, the acquittee himself may petition for modification only once per year. Code § 19.2-182.11(A). In the instant appeal, a modification recommendation was made by the RBHA. The record does not contain a petition filed by the appellant but reflects that he "ask[ed] the [circuit c]ourt to go along with" the RBHA's recommendation.